JAMES, J.
*1123 *657 Petitioners bring a direct challenge to the validity of a rule adopted by the Department of Land Conservation and Development (DLCD), OAR 660-036-0005, which amends Part Five of the 1994 Territorial Sea Plan (TSP) after recommendations by the Ocean Policy Advisory Council (OPAC). Petitioners contend that the Land Conservation and Development Commission (the commission) failed to comply with the applicable rulemaking procedures set out in ORS 196.471 when it adopted modified amendments to OAR 660-036-0005.[1] We agree, and accordingly, hold the amendments to OAR 660-036-0005, effective October 7, 2013, invalid.
In 1991, the Oregon Legislative Assembly established the Ocean Policy Advisory Council (OPAC). The legislature statutorily tasked OPAC with the preparation of the Territorial Sea Plan (TSP), the planning and management guidelines for Oregon's territorial sea. The territorial sea includes the waters and seabed extending three geographical miles seaward from the coastline. While the 1991 Legislative Assembly made OPAC responsible for developing the TSP, it designated DLCD as the "primary" agency and tasked the commission with certain functions connected with the adoption and amendment of the TSP. ORS 196.435 (1991), amended by Or. Laws 2003, ch. 744, § 7; ORS 196.471 (1991), amended by Or. Laws 2003, ch. 416, § 1.
In 2008, upon executive order from Governor Kulongoski, OPAC started to work on Part Five of the TSP. Part of the initial development of Part Five included bringing in voices from the ocean renewable energy sector to advise OPAC on wave energy projects and siting along the Oregon coast. In November 2009, the commission adopted Part Five: Uses of the Territorial Sea for the Development of Renewable Energy Facilities or Other Related Structures, Equipment or Facilities and filed OAR 660-036-0005.
Beginning in 2010, a comprehensive and thorough effort was undertaken to amend Part Five to include maps, data, text, and definitions. After several years of researching *658 and holding public meetings to gather information regarding possible TSP amendments to designate wave energy siting areas along the Oregon coast, OPAC submitted its recommendations to the commission after OPAC's January 3 and 4, 2013, meeting. Between January 22 and 24, 2013, the commission held its own public meetings on the recommended amendments. During this time, the commission also made findings, modified and supplemented OPAC's recommended amendments, and then adopted the modified amendments. The final amendments adopted by the commission differed from the recommendations provided by OPAC in several respects.
First, OPAC recommended that the amendments not delineate specific buffer zone distances between possible renewable energy sites and "important, sensitive, and unique resources" identified in Part Five coastal maps, but rather rely on the Oregon Department of Fish and Wildlife (ODFW) to determine specific buffer zone distances on a case-by-case basis. ODFW advocated for the delineation and use of specific buffer zone distances for selected habitat areas where permanent delineation could be supported by current scientific consensus. After finding that the delineation of specific buffer zone areas comports with statewide planning Goal 19, the commission modified OPAC's recommendation to incorporate the delineation of specific buffer zone areas in limited areas located near renewable energy facility sites.
Second, OPAC recommended adding text to the description of the Joint Agency Review Team (JART) process to make it "inclusive, especially [of] people in the impacted area." The commission determined that the OPAC description of "people in the impacted area" was imprecise and unclear. The commission rejected OPAC's recommendation and, consequently, Part Five does not include OPAC's recommended text. Rather, the commission expanded the text explaining JART membership to include, "Statewide and local organizations and advisory committees-including but not limited to those addressing *1124 areas important to fisheries, ecological resources, recreation and visual impacts." Moreover, the commission, in subparagraph B(3)(a)(3) of Part Five, included text allowing the Department of State *659 Lands to invite representatives of local jurisdictions and to specifically invite such representatives from "affected communities" to engage in the JART process.
Third, OPAC recommended including text related to the Proprietary Use and Management Area (PUMA) standards requiring that regulating agencies only accept renewable energy facility applications that have "been agreed to by the authorized users." The commission determined that this recommended amendment created a potential delegation of authority issue under the Delegation Clause, Article I, section 21, of the Oregon Constitution. The commission rejected OPAC's recommendation determining that "Part Five cannot delegate to 'authorized users' whether regulating agencies may accept renewable energy facility applications in the Proprietary Use and Management Area."
Fourth, and arguably petitioners' primary objection, concerns OPAC's recommended policy on Renewable Energy Facility Suitability Study Area (REFSSA) sites. OPAC recommended that the policy provide for flexible REFSSA siting to allow developers and local stakeholders to collaborate on the micro-siting of a REFSSA project within a larger planning area. OPAC's policy included the recommendation that Part Five, Appendix B (map) designate no more than five percent of the total area of the territorial sea as REFSSA, and that renewable energy facility development be limited to a total area not to exceed two percent of the territorial sea. In accordance with OPAC's recommended REFSSA policy, three sites received a majority of yes votes from OPAC and were designated REFSSA: Lakeside revised, Camp Rilea alternate (1nm), and Nearshore Reedsport alternate. The commission determined:
"[T]he three sites that OPAC recommended as REFSSA amounted to approximately one percent of the total territorial sea area, one-fifth the size of the proposed cap, and too small and too few to provide adequate opportunity for testing or development of most marine renewable technologies. * * * [T]he issue with the OPAC recommendations was not that they do not carry out the policies in ORS 196.405 to 196.505, but that they were so protective of marine renewable resources that they did not, in the Commission's view, *660 provide a sufficient (but limited) opportunity for marine renewable energy resources within the territorial sea."
(Emphasis omitted.) Instead, the commission "favored implementation of the flexible siting policy" and generally accepted the OPAC recommendations for limitations on the amount of area designated REFSSA and the total areas of renewable energy facility development.
But, the commission determined that
"[t]he OPAC REFSSA site recommendations [would] achieve a high level of protection for resources and uses, and specifically the protection of marine renewable resources over marine renewable energy development. * * * However, the OPAC REFSSA site recommendations would limit the areas where marine renewable energy projects could site to an extent that is more protective than required by the applicable statutes and Goal 19."
The commission concluded that, as a result of that determination, "the Commission had the discretion to expand the REFSSA areas on a limited basis, so long as it could still make the findings required by ORS 196.471." In addition to the three REFSSA sites recommended by OPAC, the commission supplemented the recommendation and added two more sites. The commission's additional REFSSA sites include OPT-Reedsport 50 MW (OPAC 5 votes yes, 6 votes no) and Nestucca/Pacific City (OPAC 1 vote yes, 10 votes no). Moreover, the commission modified the area and designation of all five sites in a variety of ways for reasons ranging from modification to avoid environmental or recreational areas to restrictions on the types of development projects to the inclusion of existing underwater infrastructure corridors.
Petitioners brought this challenge, taking exception to the rulemaking process that culminated in the adoption of amended OAR 660-036-0005, contending that the commission failed to comply with the applicable rulemaking *1125 procedures set out in ORS 196.471. According to petitioners, those statutory rulemaking procedures give the commission two options with regard to TSP amendments recommended by OPAC: The commission can find that the recommendations carry out specified policies and statewide planning goals and adopt them, or the commission can return the amendments *661 to OPAC for revision. In petitioners' view, the commission took a middle approach-modifying, supplementing, and approving the recommendations-that was not authorized under the statute. Petitioners do not challenge "whether the action fell within the reach of [the commission's] authority," rather "the question is whether the action was taken by procedures prescribed by statute." Planned Parenthood Assn. v. Dept. of Human Res. , 297 Or. 562, 565, 687 P.2d 785 (1984).
The commission, in response, argues that it satisfied the requirement in ORS 196.471(1) to "review * * * any subsequent amendments recommended by the Ocean Policy Advisory Council to * * * the Territorial Sea Plan" and make findings that "the plan or amendments" are consistent with applicable statutes and statewide planning goals. According to the commission, the text of ORS 196.471 does not prohibit the commission from reviewing and considering other recommendations in addition to OPAC's recommended amendments, nor does it prohibit the commission from adopting its own proposed modifications to the TSP. Further, the commission argues that reading such a restriction into ORS 196.471(1) would directly conflict with the commission's rulemaking authority under ORS 197.040(1)(e), which expressly authorizes the commission to "[a]ppoint advisory committees to aid it in carrying out ORS chapters 195, 196 and 197[.]"
"Under ORS 183.400(1), 'any person' may petition this court to determine the validity of a rule." Assn. of Acupuncture v. Bd. of Chiropractic Examiners , 260 Or. App. 676, 678, 320 P.3d 575 (2014). Judicial review of an administrative rule is limited to an examination of the rule under review, the statutory provisions authorizing the rule, and the documents necessary to demonstrate compliance with the applicable rulemaking procedures. ORS 183.400(3) ; see also Smith v. TRCI , 259 Or. App. 11, 13, 312 P.3d 568 (2013). After the limited examination, a court invalidates an administrative rule only if it finds that the rule violates constitutional provisions, exceeds the statutory authority of the agency that adopted the rule, or was adopted without compliance with the applicable rulemaking procedures. ORS 183.400(4) ; see also Smith , 259 Or. App. at 13, 312 P.3d 568.
*662 The issue before us is one of statutory interpretation. When faced with questions of statutory interpretation, "[t]he methodology that Oregon courts follow * * * is a distillation of settled interpretative principles, some of which have been codified in Oregon statutes since early statehood and others of which have been articulated in this court's case law for many years." State v. Gaines , 346 Or. 160, 164, 206 P.3d 1042 (2009). "[W]e begin with text and context, as we ordinarily would do [under PGE v. Bureau of Labor and Industries , 317 Or. 606, 610-12, 859 P.2d 1143 (1993) ]. We then also consider, regardless of any lack of ambiguity in that text, the legislative history pertaining to what the legislature intended." Gaines , 346 Or. at 166, 206 P.3d 1042. "A court need only consider legislative history 'for what it's worth'-and what it is worth is for the court to determine." Id. at 171, 206 P.3d 1042. As the Supreme Court has remarked, the "party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it." Id. at 172, 206 P.3d 1042. However, "[w]hen the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests-or even confirms-that legislators intended something different." Id. at 173, 206 P.3d 1042.
Although the parties argue extensively about the authority of the commission, as we explain below, the resolution of this case does not turn on the authority of the commission to make modifications to OPAC's proposed amendments. Rather, this case is about the procedure for making those modifications. ORS 196.471, which sets forth the Territorial Sea Plan review requirements, provides:
"(1) The Land Conservation and Development Commission shall review the Territorial Sea Plan and any subsequent amendments recommended by the Ocean Policy *1126 Advisory Council to either the Territorial Sea Plan or the Oregon Ocean Resources Management Plan and make findings that the plan or amendments recommended by the council:
"(a) Carry out the policies of ORS 196.405 to 196.515 [Oregon Ocean Resources Management Act]; and
"(b) Are consistent with applicable statewide planning goals, with emphasis on the four coastal goals.
*663 "(2) After making the findings required by subsection (1) of this section, the commission shall adopt the Territorial Sea Plan or proposed amendments as part of the Oregon Coastal Management Program.
"(3)(a) If the commission does not make the findings required by subsection (1) of this section, the commission shall return the plan or amendments to the council for revision. The commission may specify any needed revisions.
"(b) If the council makes subsequent recommendations for amendments, the council must:
"(A) Include the commission's specified revisions in the recommendations; and
"(B) Make the subsequent recommendations for amendments within 155 days after the date that the commission returns the plan or amendments to the council for revision. The commission and the council may mutually agree to extend the time that the council is allowed under this subparagraph for submitting subsequent recommendations to the commission.
"(c) If the council does not make the subsequent recommendations for amendments within the time provided for in paragraph (b)(B) of this subsection, the commission may adopt the Territorial Sea Plan amendments recommended by the council under subsection (1) of this section, including any needed revisions specified by the commission.
"(4) Upon adoption of the Territorial Sea Plan or subsequent amendments the commission may, after consultation with affected state agencies, identify amendments to agency ocean or coastal resource management programs necessary to conform to the provisions of the adopted plan."[2]
*664 Turning to the statute, the text, context, and history of ORS 196.471 clearly show that the procedures for amendments to the TSP depend upon the collaboration of two entities: the commission and OPAC. The plain text of ORS 196.471 establishes the pathways for that collaboration. First, just as OPAC was tasked with the creation of the TSP, OPAC is tasked with bringing proposed amendments to the TSP to the commission. ORS 196.471(1). When OPAC presents proposed modifications to the TSP, the commission is faced with one of two procedural responses. First, the commission can "adopt the Territorial Sea Plan or proposed amendments." ORS 196.471(2). Under this avenue, the proposed amendments are adopted without modification. Alternatively, there is a procedure for the commission to make changes to the proposed amendments. The commission makes "recommendations for amendments" that go back to OPAC. ORS 196.471(3)(b). The commission's return of the proposed amendments to OPAC, with the commission requested changes, is also the predicate for the mandate that OPAC has "155 days after the date that the commission returns the plan or amendments to the council for revision " to return to the commission with a new version of the proposed amendments. ORS 196.471(3)(b)(B) (emphasis added).
*1127 There is only one instance where the commission is statutorily permitted to circumvent this mutual exchange and act unilaterally. If OPAC "does not make the subsequent recommendations for amendments within [155 days], the commission may adopt the Territorial Sea Plan amendments recommended by the council * * * including any needed revisions specified by the commission." ORS 196.471(3)(c).
In addition to the plain text of ORS 196.471, the interdependent relationship between the commission and OPAC is further evidenced in the statutory context and legislative history. With respect to their roles in ocean resource management, the legislature set out the duties and purposes of DLCD, the commission, and OPAC in the same statute. ORS 196.435 describes the duties and purposes of DLCD (which includes the commission) as the primary agency for *665 ocean resource management, including the duty to assist OPAC:
"(1) The Department of Land Conservation and Development is designated the primary agency for coordination of ocean resources planning. The department is designated the State Coastal Management Agency for purposes of carrying out and responding to the Coastal Zone Management Act of 1972. The department shall assist:
"(a) The Governor with the Governor's duties and opportunities to respond to federal agency programs and activities affecting coastal and ocean resources; and
"(b) The Ocean Policy Advisory Council."
Even though DLCD is the state entity "designated [as] the primary agency for coordination of ocean resources," its relationship to OPAC is not one of simple hierarchy where the commission controls. Rather, the relationship involved is more complex, with DLCD assisting OPAC, which in turn advises the commission. In short, OPAC plays a critical role. OPAC developed the initial TSP, and it remains the primary means by which a large number of interest groups, as well as the local coastal communities, participate in the planning process. ORS 196.438, the OPAC membership statute, specifies that OPAC shall include, among others:
"(c) A member of the governing body of Coos, Curry, Douglas or Lane County to be appointed by the Governor, chosen in consultation with and with the approval of a majority of the members of the governing bodies of Coos, Curry, Douglas and Lane Counties;
"(d) A member of the governing body of Clatsop, Lincoln or Tillamook County to be appointed by the Governor, chosen in consultation with and with the approval of a majority of the members of the governing bodies of Clatsop, Lincoln, and Tillamook Counties;
"(e) An elected city official from a coastal city bordering the territorial sea to be appointed by the Governor with advice from an Oregon coastal zone management association;
"(f) A representative of each of the following ocean interests, to be appointed by the Governor, and subject to *666 confirmation by the Senate pursuant to section 4, Article III, Oregon Constitution :
"(A) Commercial ocean fisheries of the North Coast from Newport north;
"(B) Commercial ocean fisheries of the South Coast south of Newport;
"(C) Charter, sport or recreation ocean fisheries of the North Coast from Newport north;
"(D) Charter, sport or recreation ocean fisheries of the South Coast south of Newport;
"(E) Ports marine navigation or transportation;
"(F) Coastal nonfishing recreation interests of surfing, diving, kayaking or windsurfing;
"(G) A coastal conservation or environmental organization;
"(H) Oregon Indian tribes appointed after consultation with the Commission on Indian Services;
"(I) A coastwide organization representing a majority of small ports and local governments, as a nonvoting member; and
"(J) A statewide conservation or environmental organization; and
"(g) Two representatives of the public, at least one of whom shall be a resident of *1128 a county bordering the territorial sea, to be appointed by the Governor."
As evidenced in the 1991 legislative history, lawmakers were chiefly concerned that territorial sea planning be a collaborative process between OPAC and the commission. Keeping with that concern, the legislature intended OPAC to have an important seat at the table, bringing along the many voices represented in its extensive membership, set out in detail in ORS 196.438. For example, Senator Bill Bradbury testified before the House Committee on Water Policy on May 9, 1991, that an important goal of Senate Bill (SB) 162 (1991) (which created OPAC) was "two-way coordination of the planning effort * * * both from the council to the local area and from the local area to the council." Tape Recording, House Committee on Water Policy, SB 162, *667 May 9, 1991, Tape 65, Side A (statement of Sen. Bill Bradbury). Senator Bradbury also testified it was important "that we maintain strong local control of coastal resources." Id . Because, as Senator Bradbury continued, "What we're trying to do, if we've got a local plan that's been acknowledged, that met our state's standards, and we're saying that if that met our state's standards, that should be a very adequate guide to [OPAC] as to what's been adopted locally and approved at the state level." Id . Moreover, as Senator Bradbury further explained, "We really, strongly need [OPAC] to develop the plan, to collate important ocean resource data, and coordinate state agencies so that Oregon speaks with one voice when talking to private, federal, or state proponents of various ocean activities." Id . "This is one of the key factors here. We've got to coordinate the state's activities in this area, and not have 10 different agencies with 10 different sets of responsibilities."Id . "And I think it's critical that in order to do that, to speak with one voice, we need to develop one plan for the territorial sea area and I would emphasize again that we are the first state in the union to develop a management plan." Id . Importantly, Senator Bradbury clarified, "Key thing: we're taking away the ability of the commission, on recommendation from the council, to amend local plan[s]. * * * So, you've got a coordination effort [that] goes both ways but you don't have anybody with a big glut [of power]." Id. ; see also Tape Recording, House Committee on Water Policy, SB 162, May 9, 1991, Tape 66, Side A.
In this case, the commission argues that, although it modified and supplemented OPAC's recommended amendments, doing so was permissible because the commission made the required findings that OPAC's recommendations comported with certain policies and were consistent with statewide planning goals. That argument misses the point. Under ORS 196.471, no findings allow the commission to modify OPAC's recommendations without first sending the required changes back to OPAC and affording it the 155 days prescribed by the statute.
The commission further argues that limiting its authority to sua sponte amend OPAC's recommendations contravenes the legislative intent that the commission be, *668 as the commission argues on appeal, the "final decisionmaker." While we agree that the statute gives the commission the final stamp of approval, the statute also prescribes a specific and limited manner in which the commission can exercise that final decision making authority. Only "[i]f the council does not make the subsequent recommendations for amendments within the time provided * * * [may] the commission * * * adopt the Territorial Sea Plan amendments recommended by the council under subsection (1) of this section, including any needed revisions specified by the commission." ORS 196.471(3)(c). That procedural path was not followed in this case. And the commission has no authority to act unilaterally outside that statutory path.
Finally, the commission's reliance on other statutes, such as ORS 183.333(1), which give it general authority to appoint advisory committees, is misplaced. The commission argues that, by virtue of its authority to create advisors in addition to OPAC, it is not limited to considering only OPAC's recommendations. But the issue in this case is not from whom the commission can seek advice. That goes to how the commission decides on the substance of the policy. The issue in this case is not substantive, it is procedural. The question is how the commission can seek modification of OPAC's recommendations. And on *1129 that procedural point, the legislature has set out a clear rulemaking procedure in ORS 196.471(3).
Here, it is undisputed by the parties that the commission modified OPAC's proposed amendments. However, as specifically prescribed in ORS 196.471(3), the commission was required to return the recommended amendments to OPAC for revision. The commission did not follow that procedure. Instead, the commission adopted modified and supplemented amendments, which it was not authorized to do and which did not comply with the applicable rulemaking procedures set out in ORS 196.471.
Amendments to OAR 660-036-0005, effective October 7, 2013, held invalid.

DLCD consists of the commission, the director of DLCD, and their respective staffs. ORS 197.075. The commission is charged with directing "the performance of the Director of [DLCD] and the director's staff of their functions * * *." ORS 197.040(1)(a).

The parties disagree about which version of ORS 196.471 controls. That statute was amended effective June 13, 2013. Petitioners contend that the newly amended statute was in effect when OAR 660-036-0005 was amended and, thus, the 2013 statute should apply in this challenge; respondent argues the prior, 1993 version of the statute should guide our review of this rulemaking.
ORS 183.355(4) provides that when a rule is amended by an agency, the agency shall file the amendment with the Secretary of State and, further, pursuant to ORS 183.355(6), "[a] rule is not valid or effective against any person or party until the rule is filed in accordance with [that] section." DLCD filed amended OAR 660-036-0005 with the Secretary of State on October 7, 2013, after amended ORS 196.471 went into effect on June 13, 2013, five months earlier.
Accordingly, we determine that the 2013 version of ORS 196.471 applies in this challenge. Regardless of which version of the statute applies, however, the outcome of this judicial review would remain the same, based on the analysis that follows.