SHORR, J.
*461 *300 Petitioners challenge the validity of the administrative rules adopted by respondent Environmental Quality Commission (EQC) that address low carbon fuel standards ( OAR 340-253-0000 to 340-253-8080 ).[1] See ORS 183.400(1) (providing jurisdiction in the Court of Appeals over petitions challenging the validity of administrative rules). They raise two arguments. First, they claim that EQC failed to evaluate certain factors that the Oregon legislature required EQC to evaluate when the legislature gave EQC the authority to adopt rules for low carbon fuel standards. Second, they claim that the adopted rules violate Article IX, section 3a, of the Oregon Constitution because the rules constitute a tax on motor vehicle fuel and the resulting tax revenue is not exclusively used for the construction and maintenance of public roads and roadside rest areas.[2] We conclude that (1) EQC did evaluate the appropriate criteria when adopting and, in one instance, later readopting and amending the challenged rules and (2) the rules adopted by EQC do not result in a tax on motor vehicle fuel and, as a result, are not subject to Article IX, section 3a. Hence, we reject petitioners' challenges and hold that the EQC rules are valid.
THE LOW CARBON FUELS STANDARDS PROGRAM
We begin with a brief background of the statute that authorized EQC to adopt low carbon fuel standards (LCFS) and then turn to a discussion of the resulting rules. In 2009, the Oregon legislature authorized EQC to "adopt [by rule] low carbon fuel standards for gasoline, diesel and fuels used as substitutes for gasoline or diesel." ORS 468A.266(1)(a).[3]
*301 The legislature's expressed intention was to reduce over time the greenhouse gas emissions caused by fuels in the Oregon transportation sector. ORS 468A.200(8). The legislature directed EQC to consider the low carbon fuel standards of other states before adopting Oregon's standards. ORS 468A.266(3). Significant to petitioners' arguments, the legislature also directed that, "[i]n adopting rules under this section, the [EQC] shall evaluate" the following:
"(a) Safety, feasibility, net reduction of greenhouse gas emissions and cost-effectiveness;
"(b) Potential adverse impacts to public health and the environment, including but not limited to air quality, water quality and the generation and disposal of waste in this state;
"(c) Flexible implementation approaches to minimize compliance costs; and
"(d) Technical and economic studies of comparable greenhouse gas emissions reduction measures implemented in other states and any other studies as determined by the commission."
*462 ORS 468A.266(5). The legislation had certain automatic sunset provisions, including one that repealed EQC's above-stated authority to adopt LCFS rules, which had a sunset date on December 31, 2015. Or. Laws 2009, ch. 754, § 8. However, before that date, the legislature repealed those sunset provisions. Or. Laws 2015, ch. 4, § 1.
EQC adopted the LCFS rules in separate phases. In 2012, EQC adopted "Phase I" of the program. In early and late 2015, EQC adopted "Phase II" of the program. As we will discuss below, in 2017, after briefing and argument was concluded in this appeal, EQC readopted all of the Phase II rules with substantial amendments. We refer to all of the rules, together, as the "LCFS rules."
*302 The Phase I rules required "regulated parties" and those that opted into the program to register, keep records, report the carbon intensity of the fuels that they produce or import, and calculate surpluses and shortfalls against certain baseline carbon intensity values. OAR 340-253-0000(4) (Dec. 11, 2012).[4] EQC's intention with Phase I was to gather information about the fuels and carbon intensity of fuels produced and imported into Oregon. Id. The ultimate goal, however, was to create a program that would "reduce the average amount of lifecycle greenhouse gas emissions per unit of fuel energy used in Oregon by a minimum of 10 percent below 2010 levels over a 10-year period." OAR 340-253-0000(2) (Dec. 11, 2012).
The Phase II rules implemented the plan to reduce greenhouse gas emissions over a 10-year period. Ultimately, EQC adopted schedules that require the average carbon intensity of a regulated party's gasoline or diesel to meet a standard that gradually decreased 10 percent from the baseline in 2015 to the standard in 2025. OAR 340-253-8010 ; OAR 340-253-8020. The Phase II rules require that regulated parties demonstrate compliance with the program by calculating credits and deficits generated by the fuels they produce or import, and generally to balance those credits and deficits at the end of each compliance period. OAR 340-253-1030. Credits are created by producing or importing fuels that have carbon intensities below the annual standard, while deficits are created by producing or importing fuels that have carbon intensities above the annual standard. OAR 340-253-1000(5)(a)-(b). The rules establish an online tracking system that tracks compliance with the program and facilitates the trade of credits between regulated parties, credit generators that opt into the program, and credit brokers (later called aggregators) who assist in trades. OAR 340-253-0620 (Feb. 1, 2015). The system facilitates credit trading between those parties with credits and those with deficits, along with the brokers who facilitate such trades, to allow for balancing and compliance at the *303 end of each compliance period. OAR 340-253-1050 (Feb. 1, 2015). It also serves as a marketplace for the purchase and sale of credits. Id .
In December 2015, EQC amended the Phase II rules. The amendments increased the baseline carbon intensity of gasoline and diesel fuels, such that importers of those fuels would need more credits if they only imported those fuels. It also increased the credit generation potential of some alternative fuels or fuel substitutes, such as corn ethanol, while decreasing the potential for others, such as soybean biodiesel. The amendments generally established new values, or new procedures for determining values, for other fuels, such as mixed fuels, electricity generators, and alternative fuels. OAR 340-253-0400(3)-(5) (Jan. 1, 2016).
As may be clear from the foregoing discussion, under the LCFS fuel program, fuel producers and importers are not required to sell only fuels that meet the annual fuel standards. Rather, if they produce or import fuels that have a carbon intensity above the annual standard, they generate a deficit that must be offset with a credit generated by a fuel with a carbon intensity below the annual standard. OAR 340-253-1030. Producers or importers may generate their own credits by importing or producing fuels with carbon intensities below the annual standard or by purchasing credits from other credit holders.
*463 OAR 340-253-1000 (5)(a) ; OAR 340-253-1005(1)(b). Producers and importers may carry over small deficits-five percent or less-at the end of a reporting period to the next compliance period without penalty. OAR 340-253-1030(4).
The rules also incorporate a number of provisions to address cost and fuel supply concerns that may arise under the program. For instance, the rules provide that the Department of Environmental Quality (DEQ) "will issue an order declaring an emergency deferral" of the program's requirements if there is a shortage of a set magnitude of fuel or low carbon fuel necessary for regulated parties to comply with the rules. OAR 340-253-2000(1). In addition, the 2015 Phase II rules require DEQ to calculate monthly the 12-month rolling average price for gasoline and diesel blends. OAR 340-253-2200(2) (Feb. 1, 2015). If that price *304 exceeds a preestablished threshold due to the costs of compliance with the program, EQC will direct DEQ to implement one or more of various cost-mitigation strategies if such strategies are necessary to mitigate the costs of compliance with the program. OAR 340-253-2200(3) (Feb. 1, 2015).[5] Those strategies include suspending various aspects of the program, eliminating compliance with the program entirely for up to one year, or "[a]dopting any other price mitigation strategy that EQC determines to be necessary to effectively mitigate the cost of compliance." OAR 340-253-2200(6) (Feb. 1, 2015).
As we have noted and will discuss in more detail when we reach the merits of petitioners' arguments, after briefing and argument in this appeal occurred, EQC substantially amended all of the Phase II rules. On November 3, 2017, EQC readopted all of the Phase II rules and, in doing so, also amended each rule.
EQC SUFFICIENTLY EVALUATED THE REQUIRED STATUTORY FACTORS "IN ADOPTING" THE PHASE II RULES
Petitioners first contend that EQC erred when it promulgated the Phase II rules in 2015 because, they claim, EQC failed to evaluate all of the factors that the legislature required it to evaluate when adopting those rules. As noted, ORS 468A.266(5) directs:
"In adopting rules under this section, the [EQC] shall evaluate:
"(a) Safety, feasibility, net reduction of greenhouse gas emissions and cost-effectiveness;
"(b) Potential adverse impacts to public health and the environment, including but not limited to air quality, water quality and the generation and disposal of waste in this state;
"(c) Flexible implementation approaches to minimize compliance costs; and *305 "(d) Technical and economic studies of comparable greenhouse gas emissions reduction measures implemented in other states and any other studies as determined by the commission."
Petitioners contend that EQC did not evaluate certain of those factors and that we must, as a result, invalidate the rules because EQC's failure means that the Phase II rules were adopted "without compliance with applicable rulemaking procedures." ORS 183.400(4)(c).
In an administrative-rule challenge originally filed in this court, we "shall" declare the challenged rule invalid only if we find that the rule
"(a) Violates constitutional provisions;
"(b) Exceeds the statutory authority of the agency; or
"(c) Was adopted without compliance with applicable rulemaking procedures."
ORS 183.400(4). As noted, petitioners' challenge is only under subsection (4)(c)-that EQC adopted the Phase II rules "without compliance with applicable rulemaking procedures." In such a challenge, our review is limited to an examination of
"(a) The rule under review;
*464 "(b) The statutory provisions authorizing the rule; and
"(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures."
ORS 183.400(3).
With those limitations in mind, respondents first contend that petitioners' arguments are not properly considered in a direct rule challenge. Respondents argue that our review is limited by the Supreme Court's decision in Wolf v. Oregon Lottery Commission , 344 Or. 345, 182 P.3d 180 (2008), because, under that case, we are not permitted in a direct rule challenge to consider the evidence before an agency or the agency commissioners' thoughts regarding such evidence. Although, as we discuss below, Wolf is generally instructive regarding the limits of our review in a rule challenge under ORS 183.400, it is not directly applicable *306 here because Wolf considered solely whether an agency exceeded its statutory authority under ORS 183.400(4)(b). It expressly did not consider whether an agency complied with applicable rulemaking procedures under ORS 183.400 (4)(c). Id. at 355, 182 P.3d 180 (noting that, "aside from information concerning whether the statutory procedures for rulemaking were followed, an issue not presented by this case ," the record on review is limited to the wording of the rule and the statutory provisions authorizing the rule (emphasis added)). As noted, in a challenge under paragraph (4)(c), we may consider under paragraph (3)(c) "all documents necessary to demonstrate compliance with applicable rulemaking procedures," which might include documents that were before the commission when it adopted the Phase II rules.
Respondents argue that the phrase "applicable rulemaking procedures" in ORS 183.400(3)(c) is essentially a term of art that means Administrative Procedure Act (APA) rulemaking procedures under ORS 183.335, ORS 183.336, and ORS 183.355. Thus, in respondents' view, we cannot examine a record of what documents EQC considered in enacting the Phase II rules unless those documents are necessary to determine EQC's compliance with APA rulemaking procedures under ORS chapter 183. Petitioners disagree and contend that an applicable rulemaking procedure may include any rulemaking procedure that the legislature applies to an administrative agency, whether in ORS chapter 183, the agency's enabling statute, or another statute mandating that the agency follow certain rulemaking procedures. On that point, we agree with petitioners. We do not find support in the statute or the case law for the contention that ORS 183.300(3)(c) limits our review of documents necessary to determine an agency's compliance with "applicable rulemaking procedures" solely to documents necessary to determine an agency's compliance with applicable APA rulemaking procedures.
The text of the statute does not state that "applicable rulemaking procedures" are solely APA rulemaking procedures. Neither the term "rulemaking" nor "rulemaking procedures" is defined in the APA. But the legislature did not limit the term "rulemaking procedures" to "APA"
*307 rulemaking procedures or rulemaking procedures "under this chapter." See PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993) (stating that, when interpreting the text of a statute, we consider rules of statutory construction that bear directly on how to read the text, including the statutory enjoinder not to insert what has been omitted); ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted[.]"). The term is limited only to "applicable" rulemaking procedures, which by its terms could include rulemaking procedures imposed either by the APA or those imposed on an agency in statutes outside the APA.[6]
*465 Addressing the context of the statute, ORS 183.400 was enacted as part of the APA and defines our review function in certain rule challenges filed directly in this court. However, again, in doing so, it does not limit our authority to review only agency conduct as it relates to the APA. Rather, ORS 183.400(3) contemplates that we will examine issues not only relating to the APA but also to the challenged rule and the underlying statutory provision authorizing the rule, which may include a review of rules and statutes outside of the APA.[7]
Turning to the case law applying ORS 183.400(3) (c) and (4)(c), the parties do not point to any cases resolving the question whether our review of a challenge that a rule was adopted without compliance with applicable rulemaking procedures includes a review of documents related solely to APA rulemaking procedures or, instead, any rulemaking procedures. On occasion, the Oregon Supreme *308 Court has at least suggested, albeit in dicta and in short, conclusory terms, that "applicable rulemaking procedures" might include those rulemaking procedures required by statutes outside the APA. See, e.g. , Gilliam County v. Dept. of Environmental Quality , 316 Or. 99, 106, 849 P.2d 500 (1993) (noting that "petitioners make no contention that the challenged regulations were 'adopted without compliance with applicable rulemaking procedures,' namely the rulemaking procedures established by ORS 459.258," a since-repealed statute that dealt with EQC's authority to establish rules for surcharges for the in-state disposal of out-of-state solid waste). We have also suggested as much in dicta , but separately have also referred in dicta to the applicable rulemaking procedures under 183.400(3)(c) and (4)(c) as "Administrative Procedure Act" rulemaking procedures. Compare Oregon Env. Council v. Oregon State Bd. of Ed. , 86 Or. App. 249, 255, 739 P.2d 581 (1987), rev'd on other grounds , 307 Or. 30, 761 P.2d 1322 (1988) (considering whether documents showed that the Board of Education followed certain statutes governing its conduct and rulemaking authority, which statutes required the board to apply certain criteria in the selection of textbooks, and seemingly considering those statutes as possible "applicable rulemaking procedures" in a direct rule challenge under ORS 183.400(4)(c) ), with Schlip v. Oregon Fish and Wildlife Comm. , 75 Or. App. 462, 467, 707 P.2d 606 (1985) (stating in dicta that "[o]ur scope of review is limited by the terms of ORS 183.400, and we may invalidate a rule only if it violates a constitutional provision, exceeds the statutory authority of the agency or was adopted without compliance with the Administrative Procedures Act, ORS ch. 183"). More recently, we have held a rule invalid for an agency's failure to "comply with the applicable rulemaking procedures set out in ORS 196.471," which is a statute pertaining to the Land Conservation and Development Commission's review of the state's Territorial Sea Plan. Ciecko v. DLCD , 290 Or. App. 655, 668, 415 P.3d 1122 (2018). By invalidating a rule based on rulemaking procedures found outside the APA, we necessarily concluded that the "applicable rulemaking procedures" for the purposes of a rule challenge under ORS 183.400(4) extend beyond APA rulemaking procedures. *309 We are persuaded that the text of ORS 183.400 reflects the legislature's intention that we may consider documents necessary to demonstrate compliance with any "applicable rulemaking procedures." Under that text, when a petitioner, as here, directly challenges a rule under ORS 183.400(4)(c) based on an agency's alleged failure to follow applicable rulemaking procedures, we may consider copies of all documents necessary to demonstrate compliance with any "applicable rulemaking procedures," ORS 183.400(3)(c), and not just those documents necessary to determine compliance with APA rulemaking procedures.
That brings us to the question whether the requirements in ORS 468A.266(5) that EQC, in adopting the LCFS rules under that section, evaluate certain factors, such as safety *466 and potential adverse effects to public health among others, are "applicable rulemaking procedures." As noted above, ORS chapter 183 does not define either "rulemaking" or a "rulemaking procedure." In administrative law, "rulemaking" is a legal term of art meaning "the process used by an administrative agency to formulate, amend, or repeal a rule or regulation." Black's Law Dictionary 1530 (10th ed. 2014). A "procedure" is "a particular way of doing or of going about the accomplishment of something." Webster's Third New Int'l Dictionary 1807 (unabridged ed. 2002). Applying those definitions to ORS 468A.266(5), we conclude that the requirement that EQC evaluate certain factors "in adopting rules under th[at] section" is a rulemaking procedure. EQC was required to evaluate certain factors in adopting the LFCS rules, meaning it was required to follow a procedure or, in other words, it had to go about adopting the rules through a "particular way of doing or going about the accomplishment of something."
We return to whether the Supreme Court's decision in Wolf limits our review and also consider whether Wolf proscribes our understanding of the term "applicable rulemaking procedures." As noted, Wolf has limited application here because that case arose out of a petitioner's challenge under ORS 183.400(4)(b) to an agency's statutory authority to promulgate a regulatory payment system. Our review under that circumstance is limited to consideration *310 of the rule under review and the statutory provision authorizing the rule. Wolf , 344 Or. at 355, 182 P.3d 180 ; ORS 183.400(3)(a), (b). In this case, which was filed pursuant to ORS 183.400 (4)(c), we may consider "copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures." ORS 183.400(3)(c). We recognize that, in the context of a statutory authority challenge, Wolf bars "an inquiry into the thinking processes of administrators and agency heads who were performing their quasi-legislative function as rulemakers *** given the limited scope of the issues under ORS 183.400(3)." Wolf , 344 Or. at 355, 182 P.3d 180. This is not such a challenge and, in this case, we consider only whether the documents indicate that EQC engaged in any evaluation of the statutorily mandated factors in adopting the LCFS rules. We do not examine the agency's thinking process, consider how it weighed any criteria, or attempt a substantive consideration of whether the agency made an appropriate policy choice given a particular statutory mandate. While the line may be close in some cases where petitioners try to raise what is essentially a challenge to an agency's statutory authority under ORS 183.400(4)(b) under the guise of a challenge to whether the agency followed proper rulemaking procedures under ORS 183.400 (4)(c), we conclude that petitioners' assertion that EQC failed to evaluate the statutorily mandated factors in adopting the LCFS rules is a proper procedural rulemaking challenge under ORS 183.400(4)(c).
Petitioners contend that EQC did not evaluate several factors that the legislature required it to evaluate "in adopting" the Phase II rules, namely factors relating to safety; the potential adverse effects to public health, the environment, and air and water quality; and the potential adverse effects to the generation and disposal of waste in the state. It appears, however, that all of those factors, except for an evaluation of the potential adverse effects to waste generation and disposal, are reflected in a January 25, 2011, DEQ report titled "Oregon Low Carbon Fuel Standards-Advisory Committee Process and Program Design," which was presented to EQC as part of the December 2015 amendments to the Phase II rules. Save for the dispute regarding whether EQC considered potential *311 adverse effects to waste generation and disposal "in adopting" the rules, which we discuss later, petitioners do not dispute that the DEQ report evaluates the other required statutory factors. Instead, petitioners argue that the report demonstrates, at most, that DEQ considered the relevant factors, but that "EQC itself did not consider that report" in enacting the rules. (Emphasis added.) As discussed below, we disagree, because we conclude that the relevant record demonstrates that EQC relied upon the evaluation presented to it by the DEQ 2011 report when enacting the Phase II rules. *467 The 2011 DEQ report was presented to EQC when EQC amended the Phase II rules at its meetings on December 9 and 10, 2015. In fact, as part of the rulemaking process, a link to the electronic version of the 2011 DEQ report was listed in the EQC's December 2015 meeting agenda and described as part of the "[d]ocuments relied on for rulemaking." In that same section of the agenda, EQC cited ORS 183.335(2)(b)(D), which requires that, prior to adopting a rule, the agency shall include
"[a] list of the principal documents, reports or studies, if any, prepared by or relied upon by the agency in considering the need for and in preparing the rule, and a statement of the location at which those documents are available for public inspection."
Thus, EQC, as part of the rulemaking process, included the 2011 DEQ report that it stated it "relied on" and cited the law that required it to list the documents that it either prepared or "relied upon." We conclude that EQC "relied on" the 2011 DEQ report, and the parties do not dispute that that report evaluated most of the factors listed in ORS 468A.266(5).
As noted, petitioners argue that, even if EQC did review the 2011 DEQ report, its reliance upon that report is insufficient to demonstrate that EQC independently evaluated the factors listed in ORS 468A.266(5) ; rather, it would demonstrate only that DEQ evaluated those factors. As petitioners observe, the statute provides that "the Environmental Quality Commission shall evaluate" the relevant factors.
*312 We considered a similar issue in Oregon Env. Council , 86 Or. App. 249, 739 P.2d 581. In that case, a statute required that the State Board of Education reject a textbook for use in public schools if "the state board finds [that it] does not meet *** the guidelines and criteria for review and selection established under ORS 337.035." ORS 337.055. The petitioners drew our attention to the fact that a checklist of the applicable statutory criteria for textbook selection appeared in the record, but there was no evidence that the checklist had been "filled out" or applied. Oregon Env. Council , 86 Or. App. at 253-54, 739 P.2d 581. We rejected that argument, concluding, first, that
"[t]he statutes here simply require the agencies to apply certain criteria and guidelines in making textbook selections. They do not require particularized findings or determinations to be spread on or be discernable from the record."
Id . at 255, 739 P.2d 581. We then concluded that, even assuming that the record required documentation of the board applying the statutory criteria and guidelines, the record, even barring a completed checklist, contained sufficient documentation to show that the board applied the statutory criteria. We explained:
"The record *** includes a three-page checklist containing the criteria. Unless the court assumes that the Board knew the criteria and failed to consider them, the presence of the [checklist] alone should suffice to demonstrate compliance with ORS 337.055."
Id .
Here as well, even assuming that ORS 468A.266(5) required EQC independently, and not through DEQ, to demonstrate in the record that it evaluated the relevant factors, DEQ included for EQC's review the 2011 report demonstrating an evaluation of most of the relevant statutory criteria. Given the holding in Oregon Env. Council , it is irrelevant that DEQ initially did the evaluation and then presented that evaluation to EQC for its consideration. EQC unquestionably may rely on evaluations and materials initially compiled by DEQ. We conclude that the record demonstrates that EQC evaluated most of the relevant factors when adopting the amendments to the Phase II rules in December 2015.
*313 Petitioners contend that Marbet v. Portland Gen. Elect. , 277 Or. 447, 469-70, 561 P.2d 154 (1977), prevents what it claims occurred here, namely that EQC improperly relied on DEQ to evaluate any factors that EQC was required to evaluate itself. In Marbet , the Supreme Court concluded that a state energy siting council had failed to make required findings of fact when it stated, among other things, that "the staff believes"
*468 or "the staff has concluded." Id . at 469 n 18, 561 P.2d 154. The court cautioned part-time, volunteer public council members not to think of agency staff members as the agency and themselves merely as a reviewing body, but to instead make their own findings of fact and "set and apply the standards entrusted to them by the [applicable] act." Id. at 469-70, 561 P.2d 154. Nothing in Marbet , however, prevents EQC from incorporating DEQ's evaluation into its own evaluation when undertaking its work.[8] As a result, we conclude that EQC, by relying on DEQ's analysis in its 2011 report, properly evaluated most of the factors that the legislature required it to evaluate when it enacted ORS 468A.266(5).
We turn then to whether EQC, "in adopting" the Phase II rules, evaluated the remaining factor in dispute-that is, the "[p]otential adverse impacts to *** the generation and disposal of waste in this state." ORS 468A.266 (5)(b). That factor is not evaluated or even mentioned in the 2011 DEQ report that was provided to EQC and relied upon when EQC adopted the Phase II amendments in December 2015. On November 3, 2017, however, following the initial briefing and oral argument in this appeal, EQC unanimously approved the following motion:
"Find that the Clean Fuels Program, Division 253, Chapter 340 of the Oregon Administrative Rules, including the *314 rules and rule amendments proposed in Attachment A of the report for this item, does not have any significant potential adverse impacts on the generation and disposal of waste in this state; and approve the recommendations of the Department of Environmental Quality and adopt the proposed rules presented in Attachment A of the report for this item as part of Chapter 340 of the Oregon Administrative Rules."
Thus, in November 2017, EQC found that the "rules and rule amendments proposed in Attachment A" did not have any significant potential adverse effects on the generation and disposal of waste. EQC then adopted the proposed rules in Attachment A. Based on our review of Attachment A, the proposed rules therein include all of the Phase II rules initially adopted in 2015. Further, as part of the process of adopting those proposed rules, EQC amended all of the Phase II rules. Thus, when undertaking the necessary evaluation of waste generation and disposal issues in November 2017, EQC both readopted and amended all of the Phase II rules that had existed in 2015.
In supplemental briefing to this court, EQC argues that its consideration in November 2017 of the LCFS rules' potential adverse effects on waste generation and disposal renders moot petitioners' challenge to the earlier Phase II rules, at least as to that issue, because those rules have now all been readopted and amended with the necessary evaluation by EQC. Petitioners respond that the issue is not moot and that EQC's consideration of waste generation issues is too late to satisfy the statutory requirements in ORS 468A.266(5)(b), because that consideration took place long after EQC's initial adoption of the Phase II rules in 2015, and the question remains whether EQC had to consider waste generation and disposal issues "in adopting" the Phase II rules in 2015.
Under the relevant case law on mootness, a plaintiff must initially have standing to assert its claim and, thereafter, "the plaintiff's concrete stake in the outcome must continue throughout the pendency of the case." Couey v. Atkins , 357 Or. 460, 469, 355 P.3d 866 (2015). "If, after the initiation of the action, it becomes moot, it will be dismissed for want of justiciability." Id .
*469 *315 There is no dispute that petitioners initially had standing to challenge the Phase II rules based on EQC's failure to evaluate the necessary waste generation and disposal issues "in adopting" the LCFS rules under ORS 468A.266(5). The question is whether petitioners' concrete stake in the outcome of its rule challenge to the Phase II rules continues because those rules have now been readopted and amended with the requisite evaluation by EQC of the relevant waste generation and disposal issue.
We agree with EQC that petitioners' challenge, at least on the narrow issue relating to EQC's evaluation of the waste generation and disposal issue, is now moot. Petitioners' rule challenge is asserted against the rules adopted by EQC on January 7, 2015, and the amended rules adopted on December 9, 2015, that we have collectively referred to as the Phase II rules. They contend that EQC did not follow the relevant rulemaking procedures in adopting those rules because EQC did not appropriately evaluate the rules' adverse effect on waste generation and disposal at that time. However, as discussed above, all of the 2015 Phase II rules were readopted and amended through new rulemaking in November 2017. In undertaking that process, EQC evaluated the waste generation and disposal issue. This court's ruling on whether EQC made the requisite evaluation of the waste generation and disposal issue in connection with the 2015 Phase II rules would have no practical effect on petitioners when the rules have since been readopted and amended by EQC with the necessary evaluation. See Joint Council of Teamsters #37 v. BOLI , 168 Or. App. 398, 412, 11 P.3d 247, rev. den. , 331 Or. 429, 26 P.3d 148 (2000) (concluding that a rule challenge was moot where the rule had been superseded and, therefore, a ruling on the validity of the rule would have no practical effect on the petitioners (citing Edmunson v. Dept. of Ins. and Finance , 314 Or. 291, 295, 838 P.2d 589 (1992) )). Petitioners' challenge to EQC's process in 2015-at least as to the waste generation and disposal issue-has been rendered moot by EQC's readoption and amendment of the rules in 2017 in a manner that appropriately evaluated the waste generation and disposal issue.[9]
*316 THE PHASE II RULES DO NOT VIOLATE ARTICLE IX, SECTION 3a, OF THE CONSTITUTION
Petitioners next contend that EQC erred when it adopted the Phase II rules because those rules generate a tax on motor vehicle fuel and, under Article IX, section 3a, the revenues from such taxes must exclusively be used for the construction and maintenance of public roads and roadside rest areas. It is undisputed that the payments generated by those purchasing credits in the low-carbon-fuel market are not used for the construction or maintenance of public roads and rest areas. Respondents, however, contend that the payment for a low-carbon-fuel credit is a transaction between private parties and not the exaction of a tax that is paid to the government. They further argue that the payment is voluntary and, as a result, is not a tax for that reason as well. We agree with respondents' first contention that the payment for a low carbon fuel credit is not a tax paid to the government and, as such, is not subject to the limitations in Article IX, section 3a. We do not need to reach respondents' second contention.
Under ORS 183.400(4)(a), we must invalidate a rule that violates the Oregon Constitution. Judicial review under this subsection is limited to an examination of "the face of the rule and the law pertinent to it." Wolf , 344 Or. at 355, 182 P.3d 180. The basic rules are set forth at the outset of this opinion. To restate briefly, the Phase II rules provide for a market system in which fuel producers and importers generate credits when they produce or import fuels that have carbon intensities below a set annual standard and generate deficits when they produce or import fuels with carbon intensities above the standard. OAR 340-253-1000(5)(a)-(b). Producers and importers may use their credits to meet their own compliance obligation or may either bank or transfer them.
*470 OAR 340-253-1030. There is an online reporting system that must be used to engage in credit transactions. OAR 340-253-0620(2). The parties to the credit transfer negotiate the terms of the agreement, including price, for the credit purchases. OAR 340-253-1005(2). The seller then reports the price to the online reporting system. OAR 340-253-1005 (3)(e). DEQ monitors the reporting system but plays no role *317 in establishing the price for credits and, significantly, does not receive any of the money from credit purchases.
Article IX, section 3a, dictates how revenue may be spent from "any tax levied on," among other things, the "distribution" or "importation" of motor vehicle fuel.[10] In general terms, such revenue "shall be used exclusively" for the construction or maintenance of "public highways, roads, streets and roadside rest areas in this state." Or. Const., Art. IX, § 3a (1). Former Article IX, section 3-which also allowed fuel taxes to fund highway police activity, parks, recreational, scenic, and historic uses-was initially adopted by Oregon voters in 1942 following a referral by the legislature. See Rogers v. Lane County , 307 Or. 534, 540-41, 771 P.2d 254 (1989) (describing history of section). The voters then *318 repealed Article IX, section 3, and replaced it with Article IX, section 3a, in 1980 following another referral by the legislature. Id . at 541-42, 771 P.2d 254 ; see also Oregon Telecommunications Assn. v. ODOT , 341 Or. 418, 425, 144 P.3d 935 (2006) (noting history). That referral further restricted the permissible uses of motor vehicle fuel tax revenues to align more closely with funding public highways and roads.
We interpret Article IX, section 3a, by first considering "the text of the provision that the voters adopted and the relevant case law interpreting that provision." Oregon Telecommunications Assn. , 341 Or. at 425-26, 144 P.3d 935. We may also consider the history of the adoption "should it appear useful to our analysis." State v. Algeo , 354 Or. 236, 246, 311 P.3d 865 (2013) ; cf. Stranahan v. Fred Meyer, Inc. , 331 Or. 38, 57, 11 P.3d 228 (2000) (stating that "caution must be used before ending the analysis at the first level, viz ., without considering the history of the constitutional provision at issue").
The constitutional issue in this case is whether the payment by one regulated party to another for low carbon fuel credits is "any tax levied on * * * the distribution [or] importation * * * of motor vehicle fuel." Or. Const., Art. IX, § 3a(1)(a). Article IX, section 3a, does not define the term "tax," so we accord that term its ordinary meaning. Oregon Telecommunications Assn. , 341 Or. at 429, 144 P.3d 935. The Supreme Court, relying on Black's Law Dictionary , defines the ordinary meaning of a tax as " 'any contribution imposed by government upon individuals, *471 for the use and service of the state' " whether named a tax, duty, custom, or any other name.[11] Automobile Club v. State of Oregon , 314 Or. 479, 485, 840 P.2d 674 (1992) (quoting Black's 1457 (6th ed. 1991)); see also McCann v. Rosenblum , 355 Or. 256, 261, 323 P.3d 955 (2014) (stating same in concluding that a ballot title accurately described a required markup on the price of liquor that was paid to OLCC as a tax rather than a fee). Even assuming for the purpose of this opinion that the payment for low carbon fuel credits by one regulated party to another is a "contribution imposed by government," that contribution *319 is not provided "for the use and service of the state" because no part of the payment is paid to, is used by, or services any state or governmental entity.
In Automobile Club , the Supreme Court noted that the purpose of Article IX, section 3a, is to "prevent diversion from the Highway Fund of money raised from burdens imposed on motor vehicle fuel." 314 Or. at 488, 840 P.2d 674. Specifically, "[t]he people of Oregon have directed that all government revenues from motor vehicle fuel taxes be expended for specific highway purposes." Id . Here, no "government revenues" are being diverted in the first instance. Under the Phase II rules, the cost of low carbon fuel credits is negotiated and exchanged between the regulated parties, and no part of the price is paid to the state.
Petitioners contend that it is irrelevant to the constitutional analysis that the payments exchanged between the regulated parties are not paid to the government and argue that the payments are used for the service of the state, namely servicing the state's environmental goals of reducing greenhouse gas emissions, encouraging low carbon fuels, and limiting the state's effect on climate change.[12] The parties, however, have identified no Oregon case that provides that payments that are not remitted to the state but are exchanged between parties-even assuming for this opinion that they are compelled on parties regulated by the state-qualify as a tax under Article IX, section 3a, or any other constitutional provision.
Automobile Club does not directly answer the question presented here. That case held that a purported "assessment" on retail gas stations that was calculated based on their receipt of motor vehicle fuel into underground storage tanks was, in fact, a tax under Article IX, section 3a.
*320 314 Or. at 490-91, 840 P.2d 674. The court further held that the tax violated that section because revenues from the tax were not devoted to the construction, improvement, repair, maintenance, or use of roads. Id . In Automobile Club , there was no dispute that the assessment was paid to the state and that the funds were earmarked for state programs that assisted retail gas stations in dealing with the costs of complying with regulations on underground fuel-storage tanks. Id. at 489, 840 P.2d 674. Although Automobile Club did not directly resolve the issue presented here, we conclude that its definition of the term "tax" for the purpose of Article IX, section 3a, supports our conclusion that, to be considered a tax under that section, any resulting revenue must be paid, at least in part, to the state. See also Ragsdale v. Dept. of Rev. , 321 Or. 216, 228, 895 P.2d 1348 (1995) (stating that the "collection of state revenues" is the "hallmark of a tax," and concluding that an increase in state retirement benefits was an expenditure of state funds and not the collection of the same). Because credit purchases do not involve the collection of state revenues, they do not fall within the definition of a tax.[13]
*472 CONCLUSION
For the reasons stated above, we conclude that EQC evaluated the factors that the legislature required EQC to evaluate under ORS 468A.266(5)"in adopting" and later readopting and amending the Phase II rules. We also conclude that those rules do not result in a tax on motor vehicle fuel and, therefore, are not subject to Article IX, section 3a, of the Oregon Constitution.
We therefore hold that all of the challenged rules, OAR 340-253-0000 to 340-253-8080, are valid.
OAR 340-253-0000 to 340-253-8080 held valid.

Petitioners in this consolidated review are petitioner Western States Petroleum Association, intervenor-petitioner Oregon Farm Bureau Federation, and intervenor-petitioner Oregon Trucking Associations, Inc. We collectively refer to this group as petitioners. Respondents are the Environmental Quality Commission and intervenors-respondents Oregon Environmental Council and Climate Solutions.

Petitioners initially asserted three arguments but withdrew their third argument.

EQC's authority to adopt LCFS rules derived originally from Oregon Laws 2009, chapter 754, section 6. That section was not initially codified in the ORS because it contained an automatic sunset provision that would have removed EQC's section 6 rulemaking authority on December 31, 2015. Or. Laws 2009, ch. 754, § 8. The sunset provision was repealed in 2015. Or. Laws 2015, ch. 4, § 1. Only at that point was section 6 codified in the ORS as former ORS 468A.275 (2015), renumbered as ORS 468A.266 (2018). The substance of EQC's authority did not change in any way relevant to this rule challenge between its initial passage by the legislature in 2009 and its subsequent codification and renumbering in the Oregon Revised Statutes. Accordingly, we cite to the current version, ORS 468A.266, throughout the opinion.

The initial rules were adopted in 2012. As discussed below, there were additional rules and rule amendments adopted in 2015, 2016, and 2017. We include the date of the rule where it has been subsequently amended in significant part, repealed, or renumbered.

In November 2017, EQC repealed the monthly fuel price deferral portion of the program. The monthly fuel price deferral portion of the program was replaced by adding provisions for a "credit clearance market" that was also intended as a cost containment program. OAR 340-253-1040.

The legislature has specifically referenced APA rulemaking procedures when it intends to exempt an agency from the requirements of just those procedures. As we noted in Jansen v. Atiyeh , 87 Or. App. 617, 624, 743 P.2d 765 (1987), modified on recons , 89 Or. App. 557, 749 P.2d 1230, rev. den. , 305 Or. 576, 753 P.2d 1382 (1988), the legislature, in former ORS 351.072(1) (1987), repealed by Or. Laws 2015, ch. 767, § 4, exempted the State Board of Higher Education and state educational institutions under its control from "the rulemaking provisions of ORS 183.310 to 183.550 [the Oregon APA]" when they adopt standards relating to admissions, grading, granting of degrees, and "similar academic matters," among other things.

The parties have not cited and we have not found any legislative history of ORS 183.300(3) that helps discern the legislature's intention on this issue.

In Marbet , the Supreme Court noted its concern that it was "doubly important that non-professional agency heads not think of their staff as the agency and themselves as a reviewing body, but rather understand clearly that it is their personal responsibility to determine the facts[.]" 277 Or. at 470, 561 P.2d 154. While that may be true, it is equally the case that volunteer commissions, such as the EQC, are often tasked with difficult policy decisions that require extensive background information and expert analysis. These volunteer commissions may consist entirely of individuals with full-time careers and other obligations. While it is expected that they reach their own decisions on the matters before them, it is not surprising, and also expected, that they may need to incorporate the underlying work of full-time government employees, outside experts, and others in the public when undertaking their analyses.

Petitioners do not contend that this appeal, even if moot, should be considered justiciable under ORS 14.175.

Article IX, section 3a, provides:
"(1) Except as provided in subsection (2) of this section, revenue from the following shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets, and roadside rest areas in this state:
"(a) Any tax levied on, with respect to, or measured by the storage, withdrawal, use, sale, distribution, importation or receipt of motor vehicle fuel or any other product used for the propulsion of motor vehicles; and
"(b) Any tax or excise levied on the ownership, operation or use of motor vehicles.
"(2) Revenues described in subsection (1) of this section:
"(a) May also be used for the cost of administration and any refunds or credits authorized by law.
"(b) May also be used for the retirement of bonds for which such revenues have been pledged.
"(c) If from levies under paragraph (b) of subsection (1) of this section on campers, motor homes, travel trailers, snowmobiles, or like vehicles, may be used for the acquisition, development, maintenance or care of parks or recreation areas.
"(d) If from levies under paragraph (b) of subsection (1) of this section on vehicles used or held out for use for commercial purposes, may also be used for enforcement of commercial vehicle weight, size, load, conformation and equipment regulation.
"(3) Revenues described in subsection (1) of this section that are generated by taxes or excises imposed by the state shall be generated in a manner that ensures that the share of revenues paid for the use of light vehicles, including cars, and the share of revenues paid for the use of heavy vehicles, including trucks, is fair and proportionate to the costs incurred for the highway system because of each class of vehicle. The Legislative Assembly shall provide for a biennial review and, if necessary, adjustment, of revenue sources to ensure fairness and proportionality."

Webster's similarly defines "tax" as "a usu. pecuniary charge imposed by a legislative or other public authority upon persons or property for public purposes : a forced contribution of wealth to meet the public needs of a government." Webster's at 2345.

There are a large number of state laws and regulations that impose explicit or implicit costs on private parties and are intended to serve a state policy goal. Such costs are typically then built into the total cost of goods and services exchanged between private sellers and purchasers. Without a requirement that some part of the revenue be paid to the state, it is difficult to meaningfully distinguish which of those regulations would meet the definition of a tax and which would fall short. In any event, under the circumstances of this case, the payments for low carbon fuel credits do not meet the ordinary meaning of a tax as set forth in Article IX, section 3a.

We have reviewed the history of Article IX, section 3, that was before the voters by legislative referral in 1942 and the history of Article IX, section 3a, that was before the voters by referral in 1980. We do not find that history helpful in resolving the issue before us. The voters in both instances were primarily, if not exclusively, focused on ensuring that gasoline taxes be devoted, with limited exception, to highway and road uses. The issue of what qualifies as a tax was not debated before the voters.