Argued and submitted January 8, 2021, affirmed March 1, 2023

WATERWATCH OF OREGON, INC.,
an Oregon nonprofit corporation,
*Petitioner,*

*v.*

WATER RESOURCES DEPARTMENT,
a state agency;
Water Resources Commission,
a state agency;
South Fork Water Board,
an Oregon municipal corporation;
City of Tigard,
an Oregon municipal corporation;
North Clackamas County Water Commission,
an Oregon municipal corporation;
Sunrise Water Authority,
an Oregon municipal corporation; and
City of Lake Oswego,
an Oregon municipal corporation,
*Respondents.*

Oregon Water Resources Department
S3778, S9982, S22581;
A169652 (Control)

WATERWATCH OF OREGON, INC.,
an Oregon nonprofit corporation,
*Petitioner,*

*v.*

WATER RESOURCES DEPARTMENT,
a state agency;
Water Resources Commission,
a state agency;
North Clackamas County Water Commission,
an Oregon municipal corporation;
Sunrise Water Authority,
an Oregon municipal corporation;
City of Tigard,
an Oregon municipal corporation;
City of Lake Oswego,

an Oregon municipal corporation; and
South Fork Water Board,
an Oregon municipal corporation,
*Respondents.*

Oregon Water Resources Department
S46120, S35297, S43170;
A169651

WATERWATCH OF OREGON, INC.,
an Oregon nonprofit corporation,
*Petitioner,*

*v.*

WATER RESOURCES DEPARTMENT,
a state agency;
Water Resources Commission,
a state agency;
City of Lake Oswego,
an Oregon municipal corporation;
City of Tigard,
an Oregon municipal corporation;
North Clackamas County Water Commission,
an Oregon municipal corporation;
Sunrise Water Authority,
an Oregon municipal corporation; and
South Fork Water Board,
an Oregon municipal corporation,
*Respondents.*

Oregon Water Resources Department
S32410, S37839;
A169650

527 P3d 1

Petitioner challenges a final order of the Oregon Water Resources Department (the department) that grants extensions of time to perfect municipal water right permits with diversions in the lower 3.1 miles of the Clackamas River. The key issue is whether the department could determine that the "undeveloped portion[s]" of the permits were conditioned to maintain the persistence of listed fish species in the lower 3.1 miles of the river, as required by ORS 537.230(3)(d). In a prior judicial review, the Court of Appeals had determined that the department's fish-persistence determination lacked both substantial evidence and substantial reason and remanded the case to the department. On remand, the department developed additional evidence and again granted the extensions. In this judicial review of that final order after the remand, petitioner argues that the department's decision is contrary to ORS 537.230(3)(d), is not supported by substantial

evidence or reason, and fails to contain concise findings and to apply the law to the facts. *Held*: The department's construction of ORS 537.230(3)(d), which included consideration of forecasted water use under fully developed permits to make its fish-persistence determination, is consistent with the legislative policy expressed in that statute; the department's order is supported by substantial evidence and substantial reason; and the department's statement of facts in the order is sufficiently concise and the department applied the law to the facts.

Affirmed.

Lisa A. Brown argued the cause and filed the briefs for petitioner.

Phillip M. Bender argued the cause for respondents City of Lake Oswego, City of Tigard, North Clackamas County Water Commission, and Sunrise Water Authority. Also on the brief were Jeffery W. Ring, Mark P. Strandberg, and Ring Bender LLP.

Inge D. Wells argued the cause for respondents Oregon Water Resources Department and Oregon Water Resources Commission. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Christopher D. Crean argued the cause and filed the brief for respondent South Fork Water Board. Also on the brief was Beery, Elsner & Hammond, LLP.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

This water rights case is before us a second time after our remand to the Oregon Water Resources Department (OWRD or the department) in *WaterWatch of Oregon v. Water Resources Dept.*, 268 Or App 187, 342 P3d 712 (2014) (*WaterWatch I*). In *WaterWatch I*, we reviewed three final orders of the department which granted to the City of Lake Oswego,[1] the North Clackamas County Water Commission,[2] and the South Fork Water Board (collectively, the municipal parties) extensions of time to perfect water rights under their respective water permits for the diversion of water from the lower reach of the Clackamas River for municipal use (the 2011 orders). The key issue in *WaterWatch I* was whether the department could determine, as it had, that the "undeveloped portion" of the municipal parties' permits were conditioned "to maintain, in the portions of waterways affected by water use under the permit, the persistence of fish species listed as sensitive, threatened or endangered under state or federal law," as required by ORS 537.230(3)(d).[3] We reversed and remanded the 2011 orders, concluding that the department's fish-persistence determination lacked both substantial evidence and substantial reason.

On remand, the department reopened the hearing, took additional evidence, and issued a final order after remand (the 2018 order) which supplemented the 2011 orders. The department again determined that the permits as conditioned will maintain the persistence of the listed fish species and placed conditions on the permits that are substantially similar to the conditions placed on the permits in the 2011 orders. WaterWatch seeks judicial review of the 2018 order, arguing that the decision is contrary to

---

[1] Respondent the City of Tigard is not a holder of one of the water permits at issue. However, Tigard was granted party status because it has an interest in Lake Oswego's permits through an intergovernmental agreement.

[2] Respondent Sunrise Water Authority is a co-permittee with North Clackamas County Water Commission on one permit.

[3] At the time of the first appeal and the hearing on remand, the statutory subsection at issue appeared in ORS 537.230(2)(c), which the legislature renumbered to ORS 537.230(3)(d) in 2017. Or Laws 2017, ch 704, § 1. Because the text of the provision was not amended, we use the current numbering.

ORS 537.230(3)(d), is not supported by substantial evidence or reason, and violates ORS 183.470(2), by failing to contain concise findings and to apply the law to the facts.

We conclude that the department did not err in its construction and application of ORS 537.230(3)(d). WaterWatch's arguments raise the issue of whether the department could, under the terms of the statute, consider forecasted actual water use of the municipalities at full permit development as a type of "existing data" on which to base its fish-persistence determination. In addressing that issue, we conclude that the department's construction of the statute, which includes considering forecasted water use, is consistent with the legislative policy of ORS 537.230(3)(d). We also conclude that the 2018 order is supported by substantial evidence and substantial reason, and that it does not violate ORS 183.470(2). Accordingly, we affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In *WaterWatch I*, we provided a succinct overview of the issue in this case from which we will proceed:

"The municipal parties are holders of eight separate water-right permits for municipal use that have points of diversion in the lower 3.1 miles of the Clackamas River (affected reach or lower reach). The holder of a permit for municipal water use must complete construction of any works within 20 years of obtaining the permit and put the water right to complete use within the time frame specified in the permit. ORS 537.230[(3)]. A municipal water holder can obtain an extension of time of those deadlines if the department finds that three statutory conditions have been satisfied. *Id*. At issue in these cases is the department's application of the third statutory condition in granting the municipal parties' requested extensions.

"That condition required the department to find that the 'undeveloped portion' of the municipal parties' permits are 'conditioned to maintain, in the portions of waterways affected by water use under the permit, the persistence of fish species listed as sensitive, threatened or endangered under state or federal law.' ORS 537.230[(3)(d)]. The statute requires the department to 'base its finding on existing

data and upon the advice of the State Department of Fish and Wildlife.' *Id*."

*WaterWatch I*, 268 Or App at 191-92 (footnotes omitted).

As required by statute, the department sought the advice of the Oregon Department of Fish and Wildlife (ODFW), and ODFW identified "target streamflows for fish persistence for each season (persistence flows) and advised the department to condition the undeveloped portion of each of the permits to 'maintain persistence of listed fish species consistent with the recommended flows.'" *Id*. at 196. From April to June, ODFW advised that missing persistence flows would be "'an extremely rare event'" and measures taken to address such an event "'should be reflective of how much recommended flows are being missed by and the percentage of water that is withdrawn by the municipality compared to the overall streamflow level.'" *Id*. From July to August, ODFW advised that, on occasion, persistence flows would not be met and that the permit holders should develop a plan to "'provide for a contingency to reduce [their] water use *or* augment stream flows using releases from Timothy Lake.'" *Id*. (emphasis and boldface in original). From September to November, ODFW advised that, for missed persistence flows, the permit holders should develop a plan "'to augment stream flows *and* reduce [their] water use to minimize its impact." *Id*. at 197 (emphasis and boldface in original). From December to March, ODFW advised that it did not anticipate flow-related issues. *Id*.

After receipt of that advice, the department granted the municipal parties' requested extensions. It found that "the use of the undeveloped portions of the permits would not maintain the persistence of listed fish species in the affected reach and thus imposed conditions on the permits to maintain fish persistence." *Id*. Those conditions included a statement of ODFW's recommended persistence flows for each season, an annual meeting condition for devising a strategy to use releases from Timothy Lake, and a curtailment condition to address missed persistence flows occurring after the first Monday in September through June 30. *Id*. at 198-99. ODFW concurred that the conditions were consistent with its advice to the department. *Id*. at 199.

Both WaterWatch and South Fork protested and requested a contested case hearing. An administrative law judge (ALJ) held a hearing and issued three proposed orders—one for Lake Oswego's permits, one for North Clackamas's permits, and one for South Fork's permits—that affirmed the department's conclusions and recommendations with respect to fish persistence. All parties filed exceptions to the ALJ's orders, including the department. The department ultimately issued final orders (the 2011 final orders) that modified the ALJ's legal analysis, included additional findings related to fish persistence, and adopted the three permit conditions. WaterWatch sought judicial review.

In *WaterWatch I*, we construed the fish-persistence requirement in ORS 537.230(3)(d) and rejected WaterWatch's contention that the department had applied a legally incorrect interpretation. We address that statutory interpretation in more detail below. We then turned to WaterWatch's argument that the department's decision was not supported by substantial evidence or reason. We rejected WaterWatch's arguments with respect to specific findings of fact, except for one. That finding stated, "The short-term drops below minimum streamflows predicted by [WaterWatch's expert] Jonathan Rhodes are not incompatible with maintaining the persistence of listed fish species." *Id.* at 215. We concluded that that finding was not supported by substantial evidence because nothing in the evidence expressed what constituted a short-term versus a long-term drop below persistence flows with respect to fish persistence "or why the flows predicted by Rhodes, which are not identified in the order, fall within that category." *Id.* at 218.

We further concluded that the department's ultimate determination—that the permits as conditioned will maintain the persistence of listed fish—lacked substantial reason. *Id.* We explained that the permit conditions did not ensure that diversions of the undeveloped portions of the permit would not contribute to missing the persistence flows. The department's findings, however, included that the permits, without conditions, would not maintain fish persistence and that, although not meeting the

persistence flows on a short-term basis was not necessary for fish persistence, it was necessary for fish persistence to meet those flows on a long-term basis. We explained, "The department failed to connect the dots between its finding of *what* is necessary to maintain fish persistence—long-term meeting of persistence flows—with *how* the conditions ensure that the diversion of the undeveloped portions of the municipal parties' permits do not contribute to the long-term failure to meet persistence flows." *Id.* at 223.

On remand, at the department's request, ODFW reviewed *WaterWatch I* and responded with additional explanation on which its advice was based. We spend some time describing the contents of ODFW's response because it forms the basis for the department's findings in the 2018 order.

ODFW first explained its general considerations for fish persistence, fish habitat, and the affected reach in the Clackamas River. ODFW explained that it looks at fish persistence on a population basis across the entire watershed, which means that it considers the water withdrawals in the affected reach in relation to the importance of the affected reach to the fish population at the different times of year and with respect to whether streamflow is a limiting factor for the fish in the affected reach. As to fish habitat, ODFW explained that there are three life stages to consider—migration, rearing, and spawning—which require different habitats at different times of the year depending on the fish species. As to the affected reach, ODFW explained that the reach provides a migration corridor for all four fish species at issue, provides about two to five percent of the basin-wide spawning habitat for fall Chinook, provides about one to two percent of rearing habitat in the basin for spring Chinook and winter Steelhead, and provides about 7.8 percent of rearing habitat for fall Chinook, but many or most juvenile fall Chinook likely migrate downstream out of the affected reach before August.

ODFW then explained that it compared current river conditions with future conditions. The future conditions were based on a water model prepared by Dr. Rob

Annear, an expert for the municipal parties. That model, which is called the Annual Scaled Scenario or Annual Scaled Model by the parties, provided a "high-end" estimate of future water use. Using data taken from 2000 to 2014, the Annual Scaled Scenario took the maximum recorded daily diversion for each year and scaled it up to the total withdrawal allowed under the permit and then scaled up the other days using a ratio based on the diversion for that date. ODFW explained:

> "For example, Lake Oswego has total rights of 59 cfs, of which 25 cfs are Developed and 34 cfs Undeveloped (Table 2). If its maximum recorded daily diversion for a given year was 20 cfs, the Annual Scaled diversion for this day is set at 59 cfs, and diversions for all other days are scaled up using the ratio 59/20. A recorded diversion of 15 cfs would be scaled up to 15 x (59/20) = 44.2 cfs (Figure 1)."

As such, ODFW stated, the Annual Scaled Scenario mimics the historical pattern of daily water use from 2000 to 2014 and provides an "estimate of the likely effects of full use of the cities' water rights in the future and is based on existing data." ODFW compared the Annual Scaled Scenario with the persistence flows for the affected reach and "determined the percentage of time the [persistence] flows will be missed, and the magnitude and duration of the shortfall." That comparison allowed "ODFW to make a determination whether municipal use of the undeveloped portion of the permits will likely result in short-term or long-term drops below [persistence] flows."

ODFW then defined what it meant by short-term or long-term drops below the persistence flows and the predicted future effect of water withdrawals under the permits. ODFW stated:

> "ODFW's target flows are not flows that must be constantly met in order to maintain the persistence of the affected species. Rather, they are flows necessary over the long term to maintain persistence. The target flows are based on the understanding that stream flows naturally exhibit variation both within a given year and from year to year, and that the affected fish species have adapted to these variations. A short-term drop below target flows is a

drop that allows the population of the affected species to remain fairly stable over time. A long-term drop below target flows is a drop that results in either a new normal at a lower population level or a continued decline in population level.

"Whether a given drop or set of drops below target flows constitutes a short-term or a long-term drop has to do with the frequency and magnitude of the drop, when the drop occurs and the spatial extent and characteristics of the reach where the drop occurs. All of these factors determine the response of the population to drops below target flows.

"Under the Annual Scaled model water use scenario, the drops below target flows happen only part of the time within a given year, do not happen every year, are usually not a large magnitude (see following section and Table 4), and occur over a small percentage of basin habitat (Table 1). For these reasons, ODFW did not consider the projected drops below target flows resulting from municipal use of the undeveloped portions of the permits to be 'long-term' in regard to the impact on any populations in the basin.

"However, while the Annual Scaled model scenario represents a likely maximum use scenario (and therefore likely overestimates actual use under the fully developed permits), ODFW also considered that the municipalities will have the legal right to use the full quantity of water allowed under the permits if the permits are fully developed. While such a scenario is unlikely for the reasons described above, ODFW accounted for it in its advice by recommending a curtailment condition during certain parts of the year. In ODFW's view, the curtailment condition is necessary in a 'full permitted use' scenario to avoid long-term drops below persistence flows."

ODFW then provided further explanation why the predicted streamflow drops below persistence flows constitute a short-term drop that remains compatible with fish persistence, given all the general considerations.

Finally, ODFW explained that the three recommended permit conditions would help maintain the persistence of the listed fish species. ODFW first addressed its recommended curtailment condition, which would apply

from the day after the first Monday in September through June 30. That condition would limit the maximum total amount of the undeveloped portion of the permit that could be legally diverted in proportion to the amount by which persistence flows are missed. As a second condition, ODFW recommended that, for the period from July 1 to the first Monday in September, when the curtailment condition did not apply, the municipalities should be required to enact water conservation measures or curtailment (as provided in the municipalities' required plans) on the first occurrence of a missed flow to reduce the magnitude of the missed persistence flow. As a third condition, ODFW again recommended a meeting condition for the municipal parties to meet with ODFW to develop annual strategies for Timothy Lake releases. ODFW stated that, while not necessary for fish persistence, if lake releases are shaped and timed correctly, they could contribute to the health of the fish species. In the converse, if timed and shaped incorrectly, such releases could harm the health of the fish species. ODFW explained that augmented flows are not most helpful in the summer months, but if curtailment applied in those months, the municipalities would be incentivized to call for augmented flows in those months, and not call for the augmented flows during the times it would be beneficial for fish species.

In addition to seeking ODFW's updated advice, the department determined that it needed additional evidence and referred the case for a further hearing before an ALJ. Ultimately, the department identified the following questions as the scope of issues on remand:

"1. Whether the ODFW distinction between a 'short-term drop' and a 'long-term drop' below the target flows is supported by a preponderance of the evidence.

"2. Whether [the department] can 'connect the dots' to show that the drops below the target flows will continue to maintain the persistence of the listed fish species.

"3. Whether Dr. Annear's Annual Scaled water scenario is valid and was appropriately relied upon by ODFW and [the department].

"4.   Whether the changes in the annual meeting condition are supported by a preponderance of the evidence."[4]

The ALJ took additional documentary evidence and testimony at the remand hearing and issued a proposed order to which all parties, including the department, filed exceptions. The department ultimately issued its final order on remand (the 2018 order) which adopted the ALJ's proposed order with only minor modifications in the findings, but rejected a modification of permit conditions proposed by the ALJ. The 2018 order incorporated the 2011 orders at issue in *WaterWatch I* and stated that the 2018 order "is intended to supplement and clarify the 201[1] final orders in a manner that addresses the bases for the Court of Appeals' remand. To the extent there is a direct conflict between the 201[1] final orders and this Final Order on Remand, this Final Order on Remand controls."

In the 2018 order, the department found that ODFW's response was supported by a preponderance of evidence in the record and adopted as its own findings each section of that response. The department additionally found that "ODFW concluded that water use under the Annual Scaled model water use scenario would not result in long-term drops" for the reasons set out in ODFW's response, which reasons the department found "are supported by a preponderance of evidence in the record and are adopted as findings of fact." The department further found that "ODFW considered both the results of the Annual Scaled model scenario *and* the possibility that municipalities could legally use the entirety of the permitted amounts." (Emphasis in original.)

The department then recited additional evidence from the hearing record that supported its adoption of ODFW's response as its own findings and also made additional findings about other evidence in the record, including with respect to WaterWatch's experts. With respect to the Annual Scaled Scenario, the department set out how

---

[4] The department also identified a fifth issue to address the affect, if any, of *WaterWatch of Oregon v. Water Resources Dept.*, 259 Or App 717, 316 P3d 330 (2013) (*Cottage Grove*), on one of the permits. That issue is not before us on judicial review.

Annear created the scenario, stating that he used water use data from 2000 to 2014 taken from gauge data and records of actual withdrawals at the points of diversion and then scaling up that use "as a projection for future years when the full permitted amounts would be available." The department found that Annear, "used this scale rather than applying the full permitted amount on a continuous basis because he was unaware of any municipality that has ever used its full permitted amount of water around the clock, seven days per week, and he believed that level of use would be unrealistic." The department also found that the Annual Scaled Scenario "is calibrated for flow, water level, and temperature" and that Annear "modeled temperatures that correlated well with the actual river temperatures," disputing WaterWatch's experts' "hypothesis that withdrawals from the river always caused water temperatures to rise." The department also found that Annear considered the estimate of future water use to be conservative, because the scenario did not include that South Fork will not be able to divert some of its water during low flow periods and per capita water use has been declining yearly for about 10 years.

With regard to fish persistence, as an additional finding to those adopted from ODFW's response, the department found that "[t]here is some fish use of the affected reach of the river probably at all times of year, but fish use at the low flow times is minimal."

With respect to WaterWatch's experts, the department found that two experts, John Davies and Jonathan Rhodes, based their opinions on an assumption that the municipal parties would continuously use all the water available under the permits, and a third, Dr. Christopher Frissell, concluded that any additional water withdrawal would cause declines in the listed fish populations.

The 2018 order also includes an "opinion" section discussing the evidence, WaterWatch's arguments, and the connection between the department's findings and conclusions. In that opinion, the department pointed to the evidence and its explanation of the difference between short-term and long-term drops, as well as the evidence of the listed fish species timing and type of use of the reach. The

department then rejected Rhodes' opinion because "his computations [are based] on the assumption that all of the municipalities will use all of their permitted water rights, all of the time, the 24/7 assumption." The department rejected that assumption as not supported by evidence in the record, noting that "even Rhodes admitted at [the] hearing that he had no opinion about whether any municipality had ever used the full amount of permitted water all of the time."

The department also addressed our conclusion in *WaterWatch I* that the 2011 orders lacked substantial reason, stating that ODFW "explained the connection between the fish use of the affected reach and the streamflow changes that will come with additional withdrawals." With regard to the permit conditions, the department concluded that the curtailment condition that applied between the first Monday in September through June and the condition for releases from Timothy Lake were supported by a preponderance of the evidence. The 2018 order states that the curtailment condition was only important for fish persistence if permit holders "were using close to their maximum permitted amounts almost all of the time." The department added in the 2018 order that that was "a water-use scenario which * * * is not supported by a preponderance of the evidence."

As to the summer months, the ALJ had suggested a change to the condition, which the department rejected. The ALJ recommended that, because of the uncertainty of the effects of climate change, the summer months should include a curtailment provision. The department rejected the ALJ's proposed condition because it was not supported by a preponderance of evidence. The department pointed out that the ALJ found that the summer condition that required the municipal parties to enact the first stage of their conservation plans when the persistence flow is missed, without modification, was sufficient under the evidence, but only recommended the change because the department "does not know what the future holds." The department explained that that is not a sufficient basis on which to impose conditions. The department also responded that the curtailment condition (which applies from September to June) is connected to the persistence of listed fish "in a limited fashion" because it

is only "relevant to fish persistence in the unlikely event of continual use of the full quantity of water allowed under the permits once the permits are fully developed."

As to the specific remand questions, the department concluded that ODFW's distinction between a short-term and long-term drop below persistence flows was supported by a preponderance of the evidence, that it had "connected the dots" that the drops below persistence flows "will continue to maintain the persistence of the listed fish species," that ODFW and the department appropriately relied on the Annual Scaled Scenario, and that the changes in the meeting condition were supported by a preponderance of the evidence. The department then imposed the three permit conditions recommended by ODFW on each of the municipal parties' permits. WaterWatch now seeks judicial review of the 2018 order, raising several arguments.

## II.   CONSTRUCTION OF ORS 537.230(3)(d)

WaterWatch's challenges on judicial review largely rise and fall on the department's reliance on the Annual Scaled Scenario in making its fish-persistence determination under ORS 537.230(3)(d). WaterWatch argues both that the department legally erred in that reliance based on the statutory requirement and, even if it was not legal error, that the department's reliance was not based in substantial evidence or reason. We first address the question of what the statute requires.

ORS 537.230(3)(d) provides:

"(3)   *** However, the department may order and allow an extension of time to complete construction or to perfect a water right beyond the time specified in the permit under the following conditions:

"* * * * *

"(d)   For the first extension issued after June 29, 2005, for a permit for municipal use issued before November 2, 1998, the department finds that the undeveloped portion of the permit is conditioned to maintain, in the portions of waterways affected by water use under the permit, the persistence of fish species listed as sensitive, threatened or endangered under state or federal law. The department

shall base its finding on existing data and upon the advice of the State Department of Fish and Wildlife. An existing fish protection agreement between the permit holder and a state or federal agency that includes conditions to maintain the persistence of any listed fish species in the affected portion of the waterway is conclusive for purposes of the finding."

The department has interpreted ORS 537.230(3)(d) in its rules and through its application of the statute in this case.[5] Under OAR 690-315-0080, the department has set out how it will evaluate the fish-persistence requirement in ORS 537.230(3)(d). That rule provides that the department must find that "use of the undeveloped portion of the permit will maintain the persistence of the listed fish species" or if it will not, that "the undeveloped portion of the permit is conditioned to maintain the persistence of listed fish species." OAR 690-315-0080(1)(f)(B), (C). The rule also provides that the department's finding "shall be limited to impacts related to streamflow as a result of use of the undeveloped portion of the permit and further limited to where, as a result of use of the undeveloped portion of the permit, ODFW indicates that streamflow would be a limiting factor for the subject listed fish species." OAR 690-315-0080(2). The department has defined "[u]se of the undeveloped portion of the permit" to mean "the diversion of the undeveloped portion of a surface water permit." OAR 690-315-0010(6)(e).

In the 2018 order, the department followed its rules, and determined that the existing data showed that, once the permits were fully developed, the municipal parties' use of the undeveloped portion of the permits was unlikely to exceed the forecast in the Annual Scaled Scenario and thus it was the proper basis from which to initially determine if use of the undeveloped portion of the permits would affect fish persistence. The department further determined that the use predicted under the Annual Scaled Scenario would maintain the persistence of the listed fish species. But, in

---

[5] On judicial review, South Fork responds to WaterWatch with an interpretation of ORS 537.230(3)(d) that the other municipal parties and the department have joined. However, South Fork's proffered interpretation does not precisely track that of the department, as provided in its rules and the 2018 order. Thus, we do not separately address South Fork's argument.

the event that the municipal parties' use exceeded that under the Annual Scaled Scenario, the department determined that the permit conditions placed on the extensions would maintain the persistence of the listed fish species.

The thrust of WaterWatch's argument in its first assignment of error is that the department did not make a fish-persistence determination based on permit conditions, as required by ORS 537.230(3)(d), but instead based its determination on the projected use under the Annual Scaled Scenario, a projected use that the municipal parties are not required to follow and was not made a permit condition. The problem, WaterWatch argues, is that the statute requires the department to condition the undeveloped portion of the permit to maintain fish persistence and that the statutory requirement cannot be avoided by instead claiming that the municipal parties will not use the entire undeveloped portion of the permits. WaterWatch asserts that the department was required to determine fish persistence based on the full amount of water the municipal parties are legally allowed to use under the permits. WaterWatch focuses solely on the phrase "the undeveloped portion of the permit is conditioned to maintain *** the persistence of [listed] fish species" and asserts that the department failed to apply that phrase on remand as directed in *WaterWatch I*.

In *WaterWatch I*, we construed the phrase "is conditioned to maintain *** the persistence of [listed] fish species." We determined that that phrase was an "inexact term" because it "is a phrase that expresses a complete legislative policy to ensure that further development of municipal permits will maintain fish persistence," but was not so precise that the terms did not require interpretation by the department. *WaterWatch I*, 268 Or App at 205; *see also id.* ("'Although [inexact terms] embody a complete expression of legislative meaning, that meaning always may not be obvious. As to "inexact terms, the task of the agency, and ultimately of the court, is to determine what the legislature intended by using those words."'" (Quoting *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353-54, 15 P3d 29 (2000) (internal citations omitted).). Then, considering the text in context, and in light of the relevant

legislative history, we concluded that, in using that phrase, "the legislature intended that the undeveloped portions of the permits be subject to conditions—that is, fulfillment of the conditions is a prerequisite to diversion of the undeveloped portions—that preserve from decline the continued existence, or endurance of listed fish species." *Id*. at 207. We further explained that the legislature "focused on the long-term preservation or endurance of fish population health in the affected waterway." *Id*. at 210. We rejected WaterWatch's arguments that the department applied a legally incorrect interpretation of the statute in its 2011 final orders. We explained:

> "The legislative policy of the statute focuses on long-term fish population health in the affected waterway. It does not express a policy that no habitat may be impaired or that no individual fish may be allowed to perish or leave. The department's interpretation of the statute contained in its final orders—that the department is required to condition the permits to maintain long-term population health of listed fish species—is consistent with the legislature's policy."

*Id*. at 211. Thus, our remand to the department was not based on any misunderstanding by the department of the legal standard in ORS 537.230(3)(d) that it was required to apply.

        Based on that prior construction, WaterWatch is correct that the statute requires the undeveloped portion of the permit to be conditioned—a prerequisite that must be met to divert the undeveloped portion of the permit— to maintain fish persistence and that the focus must be on long-term fish population health in the affected waterway. However, that prior construction, and that phrase in the statute, does not address the details of *how* the department (or ODFW) is to determine whether conditions (or what kind of conditions) are needed for long-term fish population health. *See WaterWatch I*, 268 Or App at 205 (what makes the disputed phrase inexact is that "the agency must use judgment to determine what conditions it will need to impose on individual applications for extensions of time to effect [the legislature's] complete policy statement").

The statute provides additional guidance on that topic: "The department shall base its finding on existing data and upon the advice of [ODFW]." As we noted in *WaterWatch I*, the department must use judgment to arrive at its finding that the undeveloped portion of the permit is conditioned on fish persistence. We note now that the factual bases for that judgment must be existing data and the advice of ODFW. Given that context, we understand WaterWatch to argue that the department's exercise of judgment in this case was inconsistent with the statute because the only "existing data" the department can permissibly consider with respect to streamflow is reflected in a simple equation: current, or perhaps projected future, streamflow (absent the diversion of the undeveloped portion of the permit) minus the full amount of the undeveloped portion of the permit. Because the Annual Scaled Scenario is not part of that equation, they contend, the department's reliance on it is inconsistent with the department's task as set out in the statute.

As explained below, we disagree. In OAR 690-315-0080, the department set forth the methodology for addressing its task under ORS 537.230(3)(d), which provides, as relevant:

"(1)  In order to approve an application for an extension of time for municipal and quasi-municipal water use permits holders to complete construction and/or apply water to full beneficial use pursuant to ORS 537.230 or 537.630, the Department shall find:

"* * * * *

"(f)  For the first extension issued after June 29, 2005 for municipal water use permits issued before November 2, 1998:

"* * * * *

"(B)  It is determined that use of the undeveloped portion of the permit will maintain the persistence of listed fish species in the portions of waterways affected by water use under the permit; or

"(C)  If it is determined that use of the undeveloped portion of the permit would not maintain the persistence of

listed fish species in the portions of the waterways affected by water use under the permit, the undeveloped portion of the permit is conditioned to maintain the persistence of listed fish species in the portions of the waterways affected by water use under the permit.

"(2)   The Department's finding for municipal use permits under subsection (1)(f) of this rule shall be based on existing data and advice of the Oregon Department of Fish and Wildlife (ODFW). The Department's finding shall be limited to impacts related to streamflow as a result of use of the undeveloped portion of the permit and further limited to where, as a result of use of the undeveloped portion of the permit, ODFW indicates that streamflow would be a limiting factor for the subject listed fish species.

"* * * * *

"(g)   The Department may place fishery resource protection conditions on the undeveloped portion of the permit in the extension proposed and final order under [OAR] 690-315-0050 if the Department finds that, without such conditions, use of the undeveloped portion of the permit will not maintain, in the portions of waterway affected by water use under the permit, the persistence of listed fish species."

The department further defined "[u]se of the undeveloped portion of the permit" to mean "the diversion of the undeveloped portion of a surface water permit" and "[p]ortions of waterways affected by water use under the permit" to mean "those portions of the drainage basin at or below the point of diversion for a surface water permit." OAR 690-315-0010 (6)(e), (f).

Under that rule, the department broke down its task to first determine whether diversion of the undeveloped portion of the permit would or would not maintain the persistence of the listed fish. And in making that determination, the department further defined what "existing data" and "advice" would be considered by providing that its finding "shall be limited to impacts related to streamflow as a result of use of the undeveloped portion of the permit and further limited to where, as a result of use of the undeveloped portion of the permit, ODFW indicates that streamflow would be a limiting factor for the subject listed fish species."

In the 2018 order, the department clarified its application of the rule, by explaining that diversion of the undeveloped portion of the permit was the amount of water the municipalities would use at full permit development, as supported by a preponderance of evidence in the record. Here, that was the Annual Scaled Scenario which was based on 15 years of existing data of historical use scaled up to full permit development, a method that captures natural seasonal variation. The department then used the Annual Scaled Scenario to determine the "impacts related to streamflow as a result of the use of the undeveloped portion of the permit." OAR 690-315-0080(2).

We are not persuaded that there is anything in the department's rule or orders that is contrary to the expressed legislative policy in ORS 537.230(3)(d). In two prior cases, we have discussed the legislative policy in that statute. First, we have concluded that the statute reflects a legislative policy "to allow municipal users additional time—beyond that specified in the permit or a previous extension—to perfect their water right, while at the same time ensuring the protection of public resources and meaningful public participation in extension proceedings." *WaterWatch of Oregon, Inc. v. Water Resources Dept.*, 259 Or App 717, 741, 316 P3d 330 (2013) (*Cottage Grove*). Additionally, as discussed in *WaterWatch I*, the primary phrase "maintain *** the persistence of [listed] fish species," "is a phrase that expresses a complete legislative policy to ensure that further development of municipal permits will maintain fish persistence." *WaterWatch I*, 268 Or App at 205. Further, the legislature required that the department base its fish-persistence finding on existing data and the advice of ODFW. The department's construction and application of the statute, as discussed above, is not contrary to those legislative policies.

WaterWatch's attempt to find in the statute a restriction of data on streamflow to a simple subtraction problem—current or projected streamflow minus the full amount of water that could ever be used as a result of the development of the permit—is unfounded. The statute does not direct the department to subtract the entire amount of water that represents the undeveloped portion of the permit from the river

and make its determination from there. Rather, the statute directs the department to base its determination on existing data and the advice of ODFW. That is a policy directive to use data currently in existence to determine what is needed to prevent a future potential harm. It is not contrary to that legislative policy for the department to use existing data on water use patterns to determine what future use will likely be once permits are fully developed so that it can make a reality-based decision on what is needed to maintain fish persistence. The department's construction and application of the statute in its OAR and orders in this case are not inconsistent with the statute. We therefore reject WaterWatch's first assignment of error.

### III.   SUBSTANTIAL EVIDENCE AND SUBSTANTIAL REASON

In its second, third, and fifth assignments of error, WaterWatch asserts, for a number of reasons, that the 2018 order is not based on substantial evidence or reason. Instead of addressing each of those reasons in the scattershot manner in which they are presented by WaterWatch, we focus our analysis on those areas that the department was required to address on remand from *WaterWatch I*. As explained below, we conclude that the 2018 order, and, in particular the department's fish-persistence determination, is supported by substantial evidence and reason.

### A.   *Standard of Review*

We first turn to our standard of review. "Under ORS 183.482(8)(c), we are required to set aside or remand the department's final orders if they are not supported by substantial evidence." *WaterWatch I*, 268 Or App at 212; ORS 536.075(2), (3) (judicial review of a contested case order issued by the department is to be conducted according to ORS 183.482); *see also* ORS 536.075(9) ("The [Court of Appeals] may remand the case for further evidence taking, correction or other necessary action. The court may affirm, reverse, modify or supplement the order appealed from, and make such disposition of the case as the court determines to be appropriate."). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole,

would permit a reasonable person to make that finding."
ORS 183.482(8)(c). Our review for substantial evidence "does
not entail or permit the reviewing tribunal to reweigh or
to assess the credibility of the evidence that was presented
to the factfinding body." *Tigard Sand and Gravel, Inc. v.
Clackamas County*, 151 Or App 16, 20, 949 P2d 1225 (1997),
*rev den*, 327 Or 83 (1998). As part of our substantial evi-
dence review, "we [also] look at whether the findings provide
'substantial reason' to support the legal conclusion reached
by the agency." *Warkentin v. Employment Dept.*, 245 Or App
128, 134, 261 P3d 72 (2011).

B.   *Short-Term Versus Long-Terms Drops in Persistence Flows*

        In *WaterWatch I*, we identified as a significant fail-
ing in the 2011 orders that the department did not provide
evidence or explain the difference between a short-term drop
versus a long-term drop in persistence flows with respect to
fish persistence. That failure was the basis for our conclu-
sion that the single finding—"[t]he short-term drops below
minimum streamflows predicted by Jonathan Rhodes are
not incompatible with maintaining the persistence of listed
fish species"—was not supported by substantial evidence.
*WaterWatch I*, 268 Or App at 218. That failure was also a
basis for our conclusion that the department's ultimate fish-
persistence determination lacked substantial reason. *Id.* at
223. We explained that "the department [had] in its [2011]
final order glosse[d] over the dispute about when missing
the persistence-flow minimums adversely affects the per-
sistence of the listed fish populations. Is it strictly a dura-
tional flow issue or is it related to severity as well? Is miss-
ing persistence flows from July through early October in
perpetuity a short-term or long-term drop?" *Id.* at 222.

        In one of the subparts to its second assignment of
error, WaterWatch asserts that the department failed to
properly address that remand issue. WaterWatch argues
that the definitions provided in the 2018 order for short-term
and long-term drops are circular and too vague to ensure
that the permit conditions will ensure the persistence of the
listed fish species. Specifically, WaterWatch argues that the
department does not explain what is meant by "fairly stable

over time," a drop to a "new normal," or a "continued decline in population level," nor does it define the extent of the magnitude, frequency, or timing of a drop that would constitute a short-term versus a long-term drop.

For reference, a substantial portion of the discussion in ODFW's advice, which was adopted by the department in the 2018 order, is set out above, 324 Or App 370-71, and we do not repeat it here. We conclude that substantial evidence and reason supports the department's findings about short-term versus long-term drops in relation to the fish-persistence determination in this case. In the 2018 order, the department supplied the evidence and reasoning that was missing in the 2011 orders.

In the 2018 order, the department explained the factors for determining whether missed persistence flows constitute short-term or long-term drops. Those factors are not circular or impermissibly vague, but rather are grounded in how the listed fish species—on a watershed, population basis—use the affected reach and the effect of water withdrawal of the undeveloped portion of the permits on that use. That includes looking at the "frequency and magnitude of the drop, when the drop occurs and the spatial extent and characteristics of the reach where the drop occurs." Those factors specifically interplay with the explanations about when the listed fish species use the affected reach, what they use it for, and for how much of the population that use is important.

Applying those factors, the department found that, "[u]nder the Annual Scaled model water use scenario, the drops below target flows happen only part of the time within a given year, do not happen every year, are usually not a large magnitude ***, and occur over a small percentage of basin habitat ***." As a result, the department "did not consider the projected drops below target flows resulting from municipal use of the undeveloped portions of the permits to be 'long-term' in regard to the impact on any populations in the basin." However, accounting for the fact that the municipalities legally could use the full quantity of water under their permits, although such use was unlikely, the department adopted ODFW's recommended curtailment condition

because such a condition was necessary to avoid long-term drops in persistence flows if such water use occurred.

WaterWatch does not explain how those findings are lacking in substantial evidence and instead argues that the explanation uses imprecise words for its factors or circular logic in defining short-term versus long-term. However, the department's logic is not circular, and our remand in *WaterWatch I* never required such precision. What we concluded was missing in the 2011 final orders was an explanation that connected the findings about fish persistence with the conclusion that the permits as conditioned would not contribute to a long-term drop below persistence flows. The department has now provided that necessary explanation. The department was not required to come up with formulaic definitions of short-term and long-term drops that could be applied in the abstract to other affected reaches or municipal permits or to provide precise triggering numbers for when a short-term drop becomes a long-term drop. It was required to explain what it meant in using those terms in the circumstances of this case with respect to the fish-persistence determination in this case. In the context of the whole record, which is how we are required to view the issue, the department has supplied the necessary substantial evidence and reason with respect to short-term versus long-term drops that *WaterWatch I* found missing.

Relatedly, we also reject WaterWatch's argument that the department's finding about Rhodes's opinion that we remanded in *WaterWatch I* is not supported by substantial evidence. On remand, the department adequately addressed the difference between short-term and long-term drops and found that Rhodes' analysis, which he had amended for the remand hearing, was based on an assumption about water use that was unsupported by the evidence. Primarily, WaterWatch's complaint is that the department did not accept Rhodes's analysis, which rejects many aspects of the department's analysis. It is not our role, on judicial review, to reweigh expert evidence offered at a contested case hearing. Our role is to determine whether the department could weigh the evidence as it did. *Kniss v. PERB*, 184 Or App 47, 52, 55 P3d 526 (2002). On this record, we conclude that the department could reasonably weigh the expert evidence as it

did and that substantial evidence supports the findings that WaterWatch challenges.[6] *See also WaterWatch I*, 268 Or App at 217-18 (concluding that similar findings in the 2011 final orders were supported by substantial evidence).

C.   *Curtailment Condition*

WaterWatch also argues in its second assignment of error that, in the 2018 order, the department has "functionally" eliminated the curtailment condition as a permit condition. As we understand it, WaterWatch is arguing that, by stating that the curtailment condition is a fish-persistence condition "in a limited fashion" because it is only necessary "in the unlikely event of continual use of the full quantity of water allowed under the permits once the permits are fully developed," the department changed the condition so that it cannot be triggered unless the municipalities continuously use the full quantity of water. WaterWatch's reading of the 2018 order and curtailment condition is unreasonable. The department clearly explained that the curtailment condition is necessary for fish-persistence in the event that the municipalities use the full amount of water under their permits, and not according to the expected use as modeled by the Annual Scaled Scenario. That explanation of how the curtailment condition is connected to fish persistence does not change, at all, the wording of the condition or how it is triggered or applied, which is set out in Appendix C of the 2018 order. WaterWatch does not explain how the department's findings and conclusions lack substantial evidence or reason, and we conclude that they are not so lacking.

Relatedly, we also reject WaterWatch's argument that the curtailment condition will not mitigate long-term drops below persistence flows. As in *WaterWatch I*, 268 Or App at 217-18, WaterWatch does not engage with the whole record and relies solely on its own expert's analysis. Here, relying on Annear and ODFW's experts, the department concluded that the curtailment condition was not needed to maintain the persistence of the listed fish species based on the reasonable forecast of water use under the Annual Scaled

---

[6] WaterWatch broadly challenges the department's findings and opinion in the 2018 order with respect to fish use of the reach during the low flow season, including findings 13, 15, 18, 32, 34, 36, 37, and 38.

Scenario. Instead, the department concluded the condition was necessary in the "unlikely event" that the municipal parties instead used the full amount of water available to them at all times. We will not reweigh the experts' opinions as it is not our role, and the department reasonably could weigh the evidence as it did to conclude that the curtailment condition was only necessary to mitigate unlikely long-term drops caused by the municipal parties' water use, and that it would mitigate those drops.

D.   *Fish-Persistence Determination*

We turn to WaterWatch's third assignment of error, in which it raises a substantial evidence and reason challenge to the department's fish-persistence determination, which is based on WaterWatch's assertion that the Annual Scaled Scenario is not supported by substantial evidence and that the department fails to explain why the Annual Scaled Scenario meets the fish-persistence standard. We address each of WaterWatch's assertions in turn.

WaterWatch first argues that, "[b]ecause presumed water use under the Scenario is dramatically lower than that allowed by permit condition, the Scenario cannot provide substantial evidence to support the required fish persistence determination." That argument is another way of saying that the department could not legally rely on the type of data that the Annual Scaled Scenario presents. We have already rejected that argument and do so again here.

WaterWatch next argues that the 2018 order cites no evidence in support of the Annual Scaled Scenario or the assumptions on which it is based. WaterWatch further asserts that there is evidence in the record that refutes those assumptions, because the evidence shows that the municipal parties would make use of the water under the permits in ways not accounted for by the Scenario, the Scenario does not account for usage changes brought on by climate change, and demand projections for some permit holders already exceed the amount available under the permits.

It would not benefit the bench, bar, or the parties to reiterate what is in the lengthy 2018 order, the most salient parts of which are related above. We have reviewed the

relevant parts of the record, ODFW's advice, and the 2018 order and conclude that the department's findings about, and use of, the Annual Scaled Scenario are supported by substantial evidence. To determine the reasonableness of the scenario, the department explicitly relied on the testimony of Annear about the assumptions used, the full model report, and explicitly rejected the testimony of WaterWatch's experts that relied on an assumption of water use that the department found was unrealistic and not supported by the evidence. The things WaterWatch points to as undercutting the assumptions of the Annual Scaled Scenario were all either (1) accounted for in some manner by the Annual Scaled Scenario because it captures 15 years of historical use data, (2) accounted for by the department in the 2018 order in making its determination, or (3) merely speculative statements about possible future conditions. We again decline WaterWatch's attempts to have us weigh the evidence in place of the department; that is not our role. The Annual Scaled Scenario is the type of reasonable evidence on which the department is entitled to rely for its fish-persistence determination. As noted by the department in the 2018 order, WaterWatch's arguments are primarily based on its legal position, which we have rejected, that the required assumption was full use of the permitted rights at all times.

Finally, WaterWatch argues that the department's fish-persistence determination is not supported by substantial evidence or reason, because its conclusion that the Annual Scaled Scenario results in only short-term drops below persistence flows does not apply the factors for short-term versus long-term drops and does not cite supporting data or explain why the identified drops are consistent with fish persistence.

We reject WaterWatch's arguments primarily because they fail to engage with what the department found and explained in the 2018 order. The department explicitly applied and explained its application of the short-term verses long-term drop factors to the forecasted use under the Annual Scaled Scenario to determine that that use would maintain the persistence of the listed fish species. The "limiting factor" analysis that WaterWatch points out as

irrelevant to the issue does not appear to have factored into the department's determination, as that analysis focuses on when low flows occur relative to the use the listed fish species make of the affected reach at that time. In making its arguments, WaterWatch focuses on a couple of findings in the 2018 order as inadequate, while ignoring the other findings and discussion that further support the department's fish-persistence determination. Moreover, in adopting the curtailment condition as part of its fish-persistence determination, the department was taking into consideration the possibility that future water use could exceed the Annual Scaled Scenario. We conclude that the department adequately "connected the dots" between its findings and its fish-persistence determination that the undeveloped portions of the permits are conditioned to maintain the persistence of the listed fish species.

E.   *Remaining Substantial Evidence and Reason Arguments*

Having disposed of the major challenges to the department's fish-persistence determination, we return to WaterWatch's remaining arguments in its second and fifth assignments of error.

First, we reject, without further discussion, those arguments made by WaterWatch which have not been sufficiently developed for our review, which includes (1) WaterWatch's broad objections without further argument to various statements or findings in the 2018 order, (2) WaterWatch's argument that the department failed to address WaterWatch's exceptions in the 2018 order, and (3) WaterWatch's argument that the department did not focus on the affected portion of the water way for its fish-persistence finding.

Second, we reject WaterWatch's argument that the department improperly shifted a burden of proof to it on remand. WaterWatch's argument is inappropriately presented in its second assignment of error, as it is not an argument about substantial evidence or reason. Nonetheless, the department did not misunderstand any evidentiary burdens when it stated that WaterWatch had the burden to present evidence to support its expert's assumptions about water use. WaterWatch's arguments rely solely on its assertion

that the department legally erred in considering the Annual Scaled Scenario. We have already rejected that assertion.

Third, we also reject WaterWatch's argument that the department's findings on stream temperature—findings 25 and 26—are not supported by substantial evidence or reason. Having reviewed the relevant portions of the record, we conclude that those findings are supported by substantial evidence and reason.

Finally, we reject WaterWatch's fifth assignment, in which WaterWatch challenges the department's deletion of the ALJ's recommended curtailment condition for the summer months as lacking substantial evidence. WaterWatch also summarily states that the department's climate change conclusions are not supported by substantial evidence.

There is an initial problem with WaterWatch's argument. The summer curtailment condition recommended by the ALJ was not a finding of historical fact, nor a legal conclusion by the ALJ; it was merely a suggestion based on future uncertainty. The department rejected the ALJ's suggested additional condition because it was not supported by a preponderance of evidence in the record and was instead based on speculation. The department also explained that the existing evidence on climate change was that the river could have lower flows and higher temperatures in July and August, which would have little effect on the listed species because, during those months, "the evidence in the record indicates that [the listed fish species] are not now nor will be in the future using the Affected Reach to maintain the persistence of their populations." Those findings are supported by substantial evidence in the record.

## IV.   COMPLIANCE WITH ORS 183.470(2)

In its fourth assignment of error, WaterWatch requests that we remand the 2018 final order because it fails to comply with ORS 183.470(2)[7] because it does not contain concise findings and does not apply ORS 537.230(3)(d)

_____

[7] ORS 183.470(2) provides, "In a contested case *** [a] final order shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the underlying facts supporting the findings as to each contested issue of fact and as to each ultimate fact required to support the agency's order."

to the facts. WaterWatch further argues that the recitals and quotes of the evidence in the 2018 order are not appropriate findings, pointing specifically to findings 1 through 19, 23 through 28, 31 through 33, 35, and 36. We reject those arguments.

The department made the findings necessary to support its fish-persistence determination in this case and they are sufficiently concise to for readers to understand the department's findings and conclusions. Where the department quoted evidence—primarily the ODFW response—it did so explicitly because it was adopting the quoted material as its own findings that were supported by a preponderance of the evidence in the record. The department explicitly identified other quotes as recitations from the procedural history of the case and descriptions of the evidence that further supported its adopted findings from ODFW's response. Particularly under the circumstances here, where the department is required to base its fish-persistence determination on existing data and the advice of ODFW, the department's incorporating that advice and providing the supporting evidence as part of its order was appropriate. *Cf. Marbet v. Portland Gen. Elect.*, 277 Or 447, 469 n 18, 561 P2d 154 (1977) (findings that only stated that "PGE testified" or "the staff believes" or "the staff has concluded" were not proper findings of the agency as required by law); *see also Western States Petroleum Assn. v. EQC*, 296 Or App 298, 313, 439 P3d 459 (2019) ("Nothing in *Marbet*, however, prevents EQC from incorporating DEQ's evaluation into its own evaluation when undertaking its work."). Also, as we concluded above, the department did properly apply the law to the facts in this case.

In sum, the department's construction and application of ORS 537.230(3)(d) are consistent with the legislature's expressed policy, and the department's 2018 final order is supported by substantial evidence and substantial reason.

Affirmed.